# ALLEN *v.* ILLINOIS

No. 85–5404. Argued April 30, 1986—Decided July 1, 1986

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and White, Powell, and O'Connor, JJ., joined. Stevens, J., filed a dissenting opinion, in which Brennan, Marshall, and Blackmun, JJ., joined, *post*, p. 375.

*Verlin R. Meinz* argued the cause for petitioner. With him on the briefs were *Robert Agostinelli, Peter A. Carusona,* and *Jean Herigodt.*

*Mark L. Rotert* argued the cause for respondent. With him on the brief were *Neil F. Hartigan,* Attorney General of Illinois, *Roma J. Stewart,* Solicitor General, and *Sally L. Dilgart,* Assistant Attorney General.*

Justice Rehnquist delivered the opinion of the Court.

The question presented by this case is whether the proceedings under the Illinois Sexually Dangerous Persons Act (Act), Ill. Rev. Stat., ch. 38, ¶ 105–1.01 *et seq.* (1985), are "criminal" within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination.

Petitioner Terry B. Allen was charged by information in the Circuit Court of Peoria County with committing the crimes of unlawful restraint and deviate sexual assault. Shortly thereafter the State filed a petition to have petitioner declared a sexually dangerous person within the meaning of

---

*Briefs of *amici curiae* were filed for the American Psychiatric Association by *Joel I. Klein;* for the Edwin F. Mandel Legal Aid Clinic by *Randall D. Schmidt;* and for the Mental Health Information Service, Second Judicial Department, by *Francis M. Savastano* and *Robert A. Feenick.*

the Act.[1] After a preliminary hearing on the information, the criminal charges were dismissed for lack of probable cause, and the petition was apparently dismissed as well. Petitioner was then recharged by indictment, and the petition to declare him sexually dangerous was reinstated.

Pursuant to the Act, with petitioner and counsel present, the trial court ordered petitioner to submit to two psychiatric examinations; the court explained the procedure as well as petitioner's rights under the Act, and petitioner indicated that he understood the nature of the proceedings. At the bench trial on the petition, the State presented the testimony of the two examining psychiatrists, over petitioner's objection that they had elicited information from him in violation of his privilege against self-incrimination. The trial court ruled that petitioner's statements to the psychiatrists were not themselves admissible, but allowed each psychiatrist to give his opinion based upon his interview with petitioner. Both psychiatrists expressed the view that petitioner was mentally ill and had criminal propensities to commit sexual assaults. Petitioner did not testify or offer other evidence at the trial. Based upon the testimony of the psychiatrists, as well as that of the victim of the sexual assault for which petitioner had been indicted, the trial court found petitioner to be a sexually dangerous person under the Act. Consistent with the requirements of Illinois case law, see *People* v. *Pembrock*, 62 Ill. 2d 317, 321–322, 342 N. E. 2d 28, 29–30 (1976), the court made three specific findings: that at the time of trial petitioner had been suffering from a mental disorder for not less than one year; that he had propensities to commit

---

[1] The Act defines sexually dangerous persons as follows:

"All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children, are hereby declared sexually dangerous persons." ¶ 105–1.01.

sex offenses; and that by his actions he had demonstrated such propensities.

The Appellate Court of Illinois for the Third District reversed, over one dissent. Relying on *Estelle* v. *Smith*, 451 U. S. 454 (1981), the court held that the trial court had improperly relied upon testimony obtained in violation of petitioner's privilege against self-incrimination. 123 Ill. App. 3d 669, 463 N. E. 2d 135 (1984).[2]

The Supreme Court of Illinois unanimously reversed the Appellate Court and reinstated the trial court's finding that petitioner was a sexually dangerous person. 107 Ill. 2d 91, 481 N. E. 2d 690 (1985). It held that the privilege against self-incrimination was not available in sexually-dangerous-person proceedings because they are "essentially civil in nature," the aim of the statute being to provide "treatment, not punishment." *Id.*, at 99–101, 481 N. E. 2d, at 694–695. The court also found support for its ruling in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976). Observing that the State's interest in treating, and protecting the public from, sexually dangerous persons would be "almost totally thwarted" by allowing those persons to refuse to answer questions posed in psychiatric interviews, and that the privilege would be "of minimal value in assuring reliability," the court concluded that "due process does not require the application of the privilege." 107 Ill. 2d, at 102–103, 481 N. E. 2d, at 696. Finally, the court held that "a defendant's statements to a psychiatrist in a compulsory examination under the provisions here involved may not be used against him in any subsequent

---

[2] The Appellate Court interpreted the Act to require specific proof of more than one act of sexual assault. It therefore concluded that the State had relied on the psychiatrists to make its entire case because the victim had only testified about one act. The Supreme Court of Illinois thereafter interpreted the Act to require proof of only one act, and concluded that the victim's testimony was sufficient to satisfy the State's burden in this case. 107 Ill. 2d 91, 105–106, 481 N. E. 2d 690, 697 (1985).

criminal proceedings." *Id.*, at 104, 481 N. E. 2d, at 696. We granted certiorari, 474 U. S. 979 (1985), and now affirm.

The Self-Incrimination Clause of the Fifth Amendment, which applies to the States through the Fourteenth Amendment, *Malloy* v. *Hogan*, 378 U. S. 1 (1964), provides that no person "shall be compelled in any criminal case to be a witness against himself." This Court has long held that the privilege against self-incrimination "not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Minnesota* v. *Murphy*, 465 U. S. 420, 426 (1984) (quoting *Lefkowitz* v. *Turley*, 414 U. S. 70, 77 (1973)); *McCarthy* v. *Arndstein*, 266 U. S. 34, 40 (1924). In this case the Illinois Supreme Court ruled that a person whom the State attempts to commit under the Act is protected from use of his compelled answers in any subsequent criminal case in which he is the defendant. What we have here, then, is not a claim that petitioner's statements to the psychiatrists might be used to incriminate him in some future criminal proceeding, but instead his claim that because the sexually-dangerous-person proceeding is itself "criminal," he was entitled to refuse to answer any questions at all.

The question whether a particular proceeding is criminal for the purposes of the Self-Incrimination Clause is first of all a question of statutory construction. See *United States* v. *Ward*, 448 U. S. 242, 248 (1980); *One Lot Emerald Cut Stones and One Ring* v. *United States*, 409 U. S. 232, 236–237 (1972). Here, Illinois has expressly provided that proceedings under the Act "shall be civil in nature," ¶ 105–3.01, indicating that when it files a petition against a person under the Act it intends to proceed in a nonpunitive, noncriminal manner, "without regard to the procedural protections and restrictions available in criminal prosecutions."

*Ward, supra,* at 249. As petitioner correctly points out, however, the civil label is not always dispositive. Where a defendant has provided "the clearest proof" that "the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention" that the proceeding be civil, it must be considered criminal and the privilege against self-incrimination must be applied. 448 U. S., at 248–249. We think that petitioner has failed to provide such proof in this case.

The Illinois Supreme Court reviewed the Act and its own case law and concluded that these proceedings, while similar to criminal proceedings in that they are accompanied by strict procedural safeguards, are essentially civil in nature. 107 Ill. 2d, at 100–102, 481 N. E. 2d, at 694–695. We are unpersuaded by petitioner's efforts to challenge this conclusion. Under the Act, the State has a statutory obligation to provide "care and treatment for [persons adjudged sexually dangerous] designed to effect recovery," ¶ 105–8, in a facility set aside to provide psychiatric care, *ibid.*[3] And "[i]f the patient is found to be no longer dangerous, the court shall order that he be discharged." ¶ 105–9. While the committed person has the burden of showing that he is no longer dangerous,[4] he may apply for release at any time. *Ibid.*[5]

---

[3] Under Illinois Department of Corrections regulations, the progress of persons confined at such facilities is reviewed at least every six months by a staff psychiatrist, and a request for a review hearing may be made at any time. 8 Ill. Reg. 14501 (1984).

[4] Even if he fails to meet his burden the committed person may nonetheless be conditionally released:

"If the court finds that the patient appears no longer to be dangerous but that it is impossible to determine with certainty under conditions of institutional care that such person has fully recovered, the court shall enter an order permitting such person to go at large subject to such conditions and such supervision by the Director as in the opinion of the court will adequately protect the public." ¶ 105–9.

[5] The Act further provides that "[u]pon an order of discharge every outstanding information and indictment, the basis of which was the reason for the present detention, shall be quashed." *Ibid.*

In short, the State has disavowed any interest in punishment, provided for the treatment of those it commits, and established a system under which committed persons may be released after the briefest time in confinement. The Act thus does not appear to promote either of "the traditional aims of punishment—retribution and deterrence." *Kennedy* v. *Mendoza-Martinez*, 372 U. S. 144, 168 (1963). Cf. *Addington* v. *Texas*, 441 U. S. 418, 428 (1979) (in Texas "civil commitment state power is not exercised in a punitive sense"); *French* v. *Blackburn*, 428 F. Supp. 1351, 1358–1359 (MDNC 1977), summarily aff'd, 443 U. S. 901 (1979) (State need not accord privilege against self-incrimination in civil commitment proceeding).

Petitioner offers several arguments in support of his claim that despite the apparently nonpunitive purposes of the Act, it should be considered criminal as far as the privilege against self-incrimination is concerned. He first notes that the State cannot file a sexually-dangerous-person petition unless it has already brought criminal charges against the person in question. ¶105–3. In addition, the State must prove that the person it seeks to commit perpetrated "at least one act of or attempt at sexual assault or sexual molestation." 107 Ill. 2d, at 105, 481 N. E. 2d, at 697. To petitioner, these factors serve to distinguish the Act from other civil commitments, which typically are not tied to any criminal charge and which petitioner apparently concedes are not "criminal" under the Self-Incrimination Clause. Tr. of Oral Arg. 23–24. We disagree. That the State has chosen not to apply the Act to the larger class of mentally ill persons who might be found sexually dangerous does not somehow transform a civil proceeding into a criminal one. And as the State points out, it must prove more than just the commission of a sexual assault: the Illinois Supreme Court, as we noted above, has construed the Act to require proof of the existence of a mental disorder for more than one year and a propensity to commit sexual

assaults, in addition to demonstration of that propensity through sexual assault. See *supra*, at 366–367.

The discussion of civil commitment in *Addington, supra*, in which this Court concluded that the Texas involuntary-commitment scheme is not criminal insofar as the requirement of proof beyond a reasonable doubt is concerned, fully supports our conclusion here:

> "[T]he initial inquiry in a civil commitment proceeding is very different from the central issue in either a delinquency proceeding or a criminal prosecution. In the latter cases the basic issue is a straightforward factual question—did the accused commit the act alleged? There may be factual issues to resolve in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Id.*, at 429 (emphasis in original).

While here the State must prove at least one act of sexual assault, that antecedent conduct is received not to punish past misdeeds, but primarily to show the accused's mental condition and to predict future behavior. 107 Ill. 2d, at 105, 481 N. E. 2d, at 697.

In his attempt to distinguish this case from other civil commitments, petitioner places great reliance on the fact that proceedings under the Act are accompanied by procedural safeguards usually found in criminal trials. In particular, he observes that the Act provides an accused with the right to counsel, ¶ 105–5, the right to demand a jury trial, *ibid.*, and the right to confront and cross-examine witnesses, *People* v. *Nastasio*, 19 Ill. 2d 524, 529–530, 168 N. E. 2d 728, 731 (1960). At the conclusion of the hearing, the trier of fact must determine whether the prosecution has proved the person's sexual dangerousness beyond a reasonable doubt.

¶ 105–3.01; *People* v. *Pembrock*, 62 Ill. 2d 317, 342 N. E. 2d 28 (1976). But as we noted above, the State has indicated quite clearly its intent that these commitment proceedings be civil in nature; its decision nevertheless to provide some of the safeguards applicable in criminal trials cannot itself turn these proceedings into criminal prosecutions requiring the full panoply of rights applicable there. See *People* v. *English*, 31 Ill. 2d 301, 304, 201 N. E. 2d 455, 458 (1964).

Relying chiefly on *In re Gault*, 387 U. S. 1 (1967), petitioner also urges that the proceedings in question are "criminal" because a person adjudged sexually dangerous under the Act is committed for an indeterminate period to the Menard Psychiatric Center, a maximum-security institution that is run by the Illinois Department of Corrections and that houses convicts needing psychiatric care as well as sexually dangerous persons. Whatever its label and whatever the State's alleged purpose, petitioner argues, such commitment is the sort of punishment—total deprivation of liberty in a criminal setting—that *Gault* teaches cannot be imposed absent application of the privilege against self-incrimination. We believe that *Gault* is readily distinguishable.

First, *Gault*'s sweeping statement that "our Constitution guarantees that no person shall be 'compelled' to be a witness against himself when he is threatened with deprivation of his liberty," *id.*, at 50, is plainly not good law. Although the fact that incarceration may result is relevant to the question whether the privilege against self-incrimination applies, *Addington* demonstrates that involuntary commitment does not itself trigger the entire range of criminal procedural protections. Indeed, petitioner apparently concedes that traditional civil commitment does not require application of the privilege. Only two Terms ago, in *Minnesota* v. *Murphy*, 465 U. S., at 435, n. 7, this Court stated that a person may not claim the privilege merely because his answer might result in revocation of his probationary status. Cf. *Middendorf* v. *Henry*, 425 U. S. 25, 37 (1976) ("[F]act that a proceed-

ing will result in loss of liberty does not *ipso facto* mean that the proceeding is a 'criminal prosecution' for purposes of the Sixth Amendment").

The Court in *Gault* was obviously persuaded that the State intended to *punish* its juvenile offenders, observing that in many States juveniles may be placed in "adult penal institutions" for conduct that if committed by an adult would be a crime. 387 U. S., at 49–50. Here, by contrast, the State serves its purpose of *treating* rather than punishing sexually dangerous persons by committing them to an institution expressly designed to provide psychiatric care and treatment. That the Menard Psychiatric Center houses not only sexually dangerous persons but also prisoners from other institutions who are in need of psychiatric treatment does not transform the State's intent to treat into an intent to punish. Nor does the fact that Menard is apparently a maximum-security facility affect our analysis:

> "The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." *Addington*, 441 U. S., at 426.

Illinois' decision to supplement its *parens patriae* concerns with measures to protect the welfare and safety of other citizens does not render the Act punitive.

Petitioner has not demonstrated, and the record does not suggest, that "sexually dangerous persons" in Illinois are confined under conditions incompatible with the State's asserted interest in treatment. Had petitioner shown, for example, that the confinement of such persons imposes on them a regimen which is essentially identical to that imposed upon felons with no need for psychiatric care, this might well be a different case. But the record here tells us little or nothing about the regimen at the psychiatric center, and it certainly

does not show that there are no relevant differences between confinement there and confinement in the other parts of the maximum-security prison complex. Indeed, counsel for the State assures us that under Illinois law sexually dangerous persons must not be treated like ordinary prisoners. Tr. of Oral Arg. 32–33. We therefore cannot say that the conditions of petitioner's confinement themselves amount to "punishment" and thus render "criminal" the proceedings which led to confinement.

Our conclusion that proceedings under the Act are not "criminal" within the meaning of the Fifth Amendment's guarantee against compulsory self-incrimination does not completely dispose of this case. Petitioner rather obliquely suggests that even if his commitment proceeding was not criminal, the Fourteenth Amendment's guarantee of due process nonetheless required application of the privilege. In particular, petitioner contends that the Illinois Supreme Court "grossly miscalculated" in weighing the interests set out in *Mathews* v. *Eldridge*, 424 U. S. 319 (1976). This Court has never held that the Due Process Clause of its own force requires application of the privilege against self-incrimination in a noncriminal proceeding, where the privilege claimant is protected against his compelled answers in any subsequent criminal case. We decline to do so today.

We think that the parties, and to some extent the Supreme Court of Illinois, have in their reliance on *Mathews* v. *Eldridge* misconceived that decision. *Mathews* dealt with the procedural safeguards required by the Due Process Clause of the Fifth Amendment before a person might be deprived of property, and its focus was on such safeguards as were necessary to guard against the risk of erroneous deprivation. As the Supreme Court of Illinois and the State have both pointed out, it is difficult, if not impossible, to see how requiring the privilege against self-incrimination in these proceedings would in any way advance reliability. Indeed, the State takes the quite plausible view that denying the evaluating

psychiatrist the opportunity to question persons alleged to be sexually dangerous would *decrease* the reliability of a finding of sexual dangerousness. As in *Addington*, "to adopt the criminal law standard gives no assurance" that States will reach a "better" result. 441 U. S., at 430–431.

The privilege against self-incrimination enjoined by the Fifth Amendment is not designed to enhance the reliability of the factfinding determination; it stands in the Constitution for entirely independent reasons. *Rogers* v. *Richmond*, 365 U. S. 534, 540–541 (1961) (involuntary confessions excluded "not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system"). Just as in a "criminal case" it would be no argument against a claim of the privilege to say that granting the claim would decrease the reliability of the factfinding process, the privilege has no place among the procedural safeguards discussed in *Mathews* v. *Eldridge*, which are designed to enhance the reliability of that process.

For the reasons stated, we conclude that the Illinois proceedings here considered were not "criminal" within the meaning of the Fifth Amendment to the United States Constitution, and that due process does not independently require application of the privilege. Here, as in *Addington*, "[t]he essense of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold" of the sort urged by petitioner. 441 U. S., at 431. The judgment of the Supreme Court of Illinois is therefore

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

Paragraph 105 of the Illinois Criminal Code authorizes a special procedure for the involuntary commitment of indi-

viduals found to be "sexually dangerous persons."[1] In many respects, the proceeding is virtually identical to Illinois' proceeding for prosecution of sex-related crimes. When the criminal law casts so long a shadow on a putatively civil proceeding, I think it clear that the procedure must be deemed a "criminal case" within the meaning of the Fifth Amendment.[2]

I

As the Court reaffirms today, the fact that a State attaches a "civil" label to a proceeding is not dispositive. *Ante,* at 369. Such a label cannot change the character of a criminal proceeding. *In re Gault,* 387 U. S. 1, 49–50 (1967). Moreover, the words "criminal case" in the Fifth Amendment have been consistently construed to encompass certain proceedings that have both civil and criminal characteristics.[3] And, of course, a State's duty to respect the commands in the Fifth Amendment cannot be avoided by the names it applies to its procedures or to the persons whom it accuses of wrongful conduct. It is the substance of the Illinois procedure, rather than its title, that is relevant to our inquiry.[4] Nei-

---

[1] Ill. Rev. Stat., ch. 38, ¶ 105–1.01 *et seq.* (1985).

[2] The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."

[3] See *Boyd* v. *United States,* 116 U. S. 616, 633–634 (1886) ("We are . . . clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offences committed by him, though they may be civil in form, are in their nature criminal"); *United States* v. *United States Coin & Currency,* 401 U. S. 715, 718 (1971) ("From the relevant constitutional standpoint there is no difference between a man who 'forfeits' $8,674 [to the Government in a nominally "civil" proceeding] because he has used the money in illegal gambling activities and a man who pays a 'criminal fine' of $8,674 as a result of the same course of conduct").

[4] "It is well settled that realities rather than benign motives or non-criminal labels determine the relevance of constitutional policies. *In re Winship,* . . . 397 U. S. [358, 365–366 (1970)]. See *In re Gault,* 387 U. S. 1, 21, 27, 50 . . . (1967); *Breed* v. *Jones,* 421 U. S. [519, 528 (1975)]." *United States ex rel. Stachulak* v. *Coughlin,* 520 F. 2d 931, 936 (CA7 1975).

ther the word "civil" nor the unsettling term applied by the State—"sexually dangerous person"—should be permitted to obscure our analysis.

The impact of an adverse judgment against an individual deemed to be a "sexually dangerous person" is at least as serious as a guilty verdict in a typical criminal trial. In *Humphrey* v. *Cady*, 405 U. S. 504 (1972), we referred to the potentially indefinite commitment to the "sex deviate facility" located in the Wisconsin State Prison, *id.*, at 506, as "a massive curtailment of liberty." *Id.*, at 509. In a case arising under the Illinois statute we review today, *United States ex rel. Stachulak* v. *Coughlin*, 520 F. 2d 931 (1975), the Court of Appeals for the Seventh Circuit noted that the sexually-dangerous-person proceeding authorizes far longer imprisonment than a mere finding of guilt on an analogous criminal charge.[5] Moreover, the stigma associated with an adjudication as a "sexually dangerous person" is at least as great as that associated with most criminal convictions and "is certainly more damning than a finding of juvenile delinquency." *Id.*, at 936.

The distinctive element of Illinois' "sexually dangerous person" proceeding, however, is its relationship to Illinois' criminal law. Quite simply, criminal law occupies a central role in the sexually-dangerous-person proceeding. Like the prosecution for a criminal offense, the procedure may only begin "when any person is charged with a criminal offense."[6]

---

[5] "The instant case illustrates the potential disparity in the magnitude of the loss. Stachulak was originally charged with Indecent Solicitation of a Child in violation of Ill. Ann. Stat., ch. 38, § 11-6 (Smith-Hurd 1969). That offense carried a maximum penalty of a $500 fine and less than one year imprisonment in a penal institution other than a penitentiary. Instead of prosecuting him on that charge, the state brought a proceeding, which culminated in an indeterminate commitment, under the Sexually Dangerous Persons Act. For the last five years, Stachulak has been confined at the Psychiatric Division of the Illinois State Penitentiary at Menard, a maximum-security penal institution." *Id.*, at 936, n. 4.

[6] Ill. Rev. Stat., ch. 38, ¶ 105-3 (1985).

Like the prosecution for a criminal offense, the decision whether to initiate the procedure is entrusted "to the Attorney General or to the State's Attorney of the county wherein such person is so charged."[7] Like the prosecution for a criminal offense, "the burden of proof required to commit a defendant to confinement as a sexually dangerous person shall be the standard of proof required in a criminal proceeding of proof beyond a reasonable doubt."[8] Like the prosecution for a criminal offense, if the prosecutor sustains his burden of proof, "the court shall appoint the Director of Corrections guardian of the person found to be sexually dangerous and such person shall stand committed to the custody of such guardian."[9]

Indeed, the Act even defines a "sexually dangerous person" with respect to criminal law, or rather, with respect to "criminal propensities":

> "All persons suffering from a mental disorder, which mental disorder has existed for a period of not less than one year, immediately prior to the filing of the petition hereinafter provided for, coupled with criminal propensities to the commission of sex offenses, and who have demonstrated propensities toward acts of sexual assault or acts of sexual molestation of children, are hereby declared sexually dangerous persons."[10]

According to the Illinois Supreme Court's interpretation of this definition, moreover, the prosecutor must prove that the individual charged with being a sexually dangerous person committed a criminal offense: "It is clear . . . that the statute requires more than the proof of mere 'propensity'; it also requires that the State prove that the defendant has 'demonstrated' this propensity. This language can only mean that the State must prove at least one act of or attempt at sexual

---

[7] *Ibid.*
[8] ¶ 105–3.01.
[9] ¶ 105–8.
[10] ¶ 105–1.01.

assault or sexual molestation." 107 Ill. 2d 91, 105, 481 N. E. 2d 690, 697 (1985).

Thus, the Illinois "sexually dangerous person" proceeding may only be triggered by a criminal incident; may only be initiated by the sovereign State's prosecuting authorities; may only be established with the burden of proof applicable to the criminal law; may only proceed if a criminal offense is established; and has the consequence of incarceration in the State's prison system—in this case, Illinois' maximum-security prison at Menard. It seems quite clear to me, in view of the consequences of conviction and the heavy reliance on the criminal justice system—for its definition of the prohibited conduct, for the discretion of the prosecutor, for the standard of proof, and for the Director of Corrections as custodian—that the proceeding must be considered "criminal" for purposes of the Fifth Amendment.[11]

## II

The principal argument advanced by the State—and accepted by the Court, *ante*, at 369–370—is that the statute has a benign purpose. The State points out that the statute, in appointing the Director of Corrections as guardian, requires that the Director provide "care and treatment for the person committed to him designed to effect recovery";[12] requires

---

[11] The "sexually dangerous person" proceeding shares other characteristics with criminal law as well. The statute requires that the individual "have the right to demand a trial by jury and to be represented by counsel." ¶ 105–5. Under the Illinois Supreme Court's construction, moreover, an individual has the right to confront and cross-examine witnesses. *People* v. *Nastasio*, 19 Ill. 2d 524, 529–530, 168 N. E. 2d 728, 731 (1960). Significantly, as with the latter set of requirements, many of the criminal law procedures that have been found applicable to the "sexually dangerous person" proceeding have been imposed by courts because of the nature of the proceeding. See, *e. g.*, *United States ex rel. Stachulak* v. *Coughlin*, 520 F. 2d 931 (CA7 1975) (requiring proof beyond a reasonable doubt); *People* v. *Pembrock*, 62 Ill. 2d 317, 342 N. E. 2d 28 (1976) (same); Ill. Rev. Stat., ch. 38, ¶ 105–3.01 (1985) (codifying requirement).

[12] ¶ 105–8.

that the Director place his ward "in any facility in the Department of Corrections or portion thereof set aside for the care and treatment of sexually dangerous persons";[13] and requires that the individual be released if "found to be no longer dangerous."[14]

The Illinois Supreme Court has stated unambiguously that "treatment, not punishment, is the aim of the statute." 107 Ill. 2d, at 100–101, 481 N. E. 2d, at 695. The Illinois court, of course, is the final authority on the meaning and the purpose of Illinois legislation. Nevertheless, the ultimate characterization of the sexually-dangerous-person proceeding for Fifth Amendment purposes remains a federal constitutional question.

A goal of treatment is not sufficient, in and of itself, to render inapplicable the Fifth Amendment, or to prevent a characterization of proceedings as "criminal." With respect to a conventional criminal statute, if a State declared that its goal was "treatment" and "rehabilitation," it is obvious that the Fifth Amendment would still apply. The sexually-dangerous-person proceeding similarly may not escape a characterization as "criminal" simply because a goal is "treatment." If this were not the case, moreover, nothing would prevent a State from creating an entire corpus of "dangerous person" statutes to shadow its criminal code. Indeterminate commitment would derive from proven violations of criminal statutes, combined with findings of mental disorders and "criminal propensities," and constitutional protections for criminal defendants would be simply inapplicable. The goal would be "treatment"; the result would be evisceration of criminal law and its accompanying protections.

The Illinois Attorney General nevertheless argues that the importance of treatment in the Act has a special significance.

---

[13] *Ibid.*

[14] ¶ 105–9. See also ¶ 105–8 ("The Director of Corrections as guardian shall keep safely the person so committed until the person has recovered and is released as hereinafter provided").

The State contends that recognizing a right to silence would make it impossible to reach a correct diagnosis concerning the existence of a mental disorder and the need for treatment. However, the Illinois General Assembly has squarely rejected this argument in other civil commitment proceedings. Illinois' civil commitment procedure expressly protects the individual's right to silence.[15] Quoting the Governor's Commission for the Revision of the Mental Health Code of Illinois, the Illinois Appellate Court explained this unequivocal State policy:

> "Experience in the public and private sectors has shown that application of the privilege against self-incrimination does not seriously impair the State's ability to achieve the valid objectives of civil commitment." *In re Rizer*, 87 Ill. App. 3d 795, 799, 409 N. E. 2d 383, 386 (1980).

The Attorney General's emphasis on the interference with treatment that the right of silence would create thus indeed has a significance, but not the one he suggests. For, not only would a characterization of the proceeding as "criminal" lead to a right to silence under the Fifth Amendment, but a characterization of the proceeding as "civil" would also lead to a right to silence under state law. It is only in the "sexually dangerous person" proceeding that the individual may be compelled to give evidence that will be used to deprive him of his liberty. The fact that this proceeding is unique—neither

---

[15] See Ill. Rev. Stat., ch. 91½, ¶ 3–208 (1985) ("Whenever a petition has been executed pursuant to Section 3–507, 3–601, or 3–701, and prior to this examination for the purpose of certification of a person 12 or over, the person conducting this examination shall inform the person being examined in a simple comprehensible manner of the purpose of the examination; that he does not have to talk to the examiner; and that any statements he makes may be disclosed at a court hearing on the issue of whether he is subject to involuntary admission. If the person being examined has not been so informed, the examiner shall not be permitted to testify at any subsequent court hearing concerning the respondent's admission").

wholly criminal nor civil—surely cannot justify the unique deprivation of a constitutional protection.

## III

It is, of course, true that "the State has a substantial interest in . . . protecting the public from sexually dangerous persons." 107 Ill. 2d, at 102, 481 N. E. 2d, at 696. But the fact that an individual accused of being a "sexually dangerous person" is also considered a danger to the community cannot justify the denial of the Fifth Amendment privilege; if so, the privilege would never be available for any person accused of a violent crime. The fact that it may be more difficult for the State to obtain evidence that will lead to incarceration similarly cannot prevent the applicability of the Fifth Amendment; if so, the right would never be justified, for it could always be said to have that effect. Nor can the fact that proof of sexual dangerousness requires evidence of noncriminal elements—the continuing requirement that a future criminal "propensity" be proved, for instance—prevent the applicability of the Fifth Amendment; if anything, that requirement should be the subject of greater, rather than lesser, concern.[16]

In the end, this case requires a consideration of the role and value of the Fifth Amendment. The privilege sometimes does serve the interest in making the truth-seeking function of a trial more reliable.[17] Indeed, a review of the

---

[16] See O. Holmes, The Common Law 65 (1923 ed.) ("Intent to commit a crime is not itself criminal. There is no law against a man's intending to commit a murder the day after tomorrow. The law only deals with conduct"); *Thompson* v. *Bowie*, 4 Wall. 463, 471 (1866) ("When trying a prisoner on an indictment, for a particular crime, proof that he has a general disposition to commit the crime is never permitted").

[17] "It has long been recognized that the eliciting and use of confessions or admissions require careful scrutiny. Dean Wigmore states:

" 'The ground of distrust of confessions made in certain situations is, in a rough and indefinite way, judicial experience. There has been no careful collection of statistics of untrue confessions, nor has any great number of instances been even loosely reported . . . but enough have been verified to

psychiatrists' reports in this very case suggests the propriety of that concern.[18] The basic justification for the constitutional protection, however, also rests on the nature of our free society. As a distinguished leader of the Bar stated more than 30 years ago:

> "[T]he Fifth Amendment can serve as a constant reminder of the high standards set by the Founding Fathers, based on their experience with tyranny. It is an ever-present reminder of our belief in the importance of the individual, a symbol of our highest aspirations. As such, it is a clear and eloquent expression of our basic opposition to collectivism, to the unlimited power of the state. It would never be allowed by communists, and thus it may well be regarded as one of the signs which sets us off from communism." E. Griswold, The Fifth Amendment Today 81 (1955).[19]

---

fortify the conclusion, based on ordinary observation of human conduct, that under certain stresses a person, especially one of defective mentality or peculiar temperament, may falsely acknowledge guilt. This possibility arises wherever the innocent person is placed in such a situation that the untrue acknowledgment of guilt is at the time the more promising of two alternatives between which he is obliged to choose; that is, he chooses any risk that may be in falsely acknowledging guilt, in preference to some worse alternative associated with silence.'" *In re Gault*, 387 U. S. 1, 44–45 (1967) (quoting 3 J. Wigmore, Evidence § 822 (3d ed. 1940)).

[18] One of the psychiatrist's reports stated, in part:

"The defendant wanted to be found sexually dangerous and did so because he felt that it was a better alternative than a trial trying to be found not guilty. . . . I have the definite impression that he is unreliable and that sometimes he is not telling the truth." App. 36–37.

. That doctor reported that the defendant admitted that he had "sexual intercourse" with the victim—a fact that she denied. None of the other incidents described in the doctor's report (the first of which occurred when the defendant was 10 years old) had any corroboration or involved an identified partner or victim.

[19] Cf. Amnesty International, Political Abuse of Psychiatry in the USSR, reprinted in Abuse of Psychiatry in the Soviet Union, Hearing before the Subcommittee on Human Rights and International Organizations of the House Committee on Foreign Affairs, 98th Cong., 1st Sess., 72–73 (1983)

For the Court, these concerns are not implicated today because the prosecution-initiated and prison-destined, sexually-dangerous-person proceeding is not "criminal" in nature. In my opinion, permitting a State to create a shadow criminal law without the fundamental protection of the Fifth Amendment conflicts with the respect for liberty and individual dignity that has long characterized, and that continues to characterize, our free society.

I respectfully dissent.

---

(In the Soviet Union, "[t]wo formal procedures are most commonly used to commit individuals to mental hospitals against their will: the civil and the criminal. . . . The *criminal procedure* for compulsory confinement is applicable to those who have been accused of a criminal offense, and whose mental health is called into question. . . . Under this procedure the accused loses virtually all of his or her procedural rights and is left only with the passive right to an honest psychiatric examination and a fair court hearing").