763 N.E.2d 351 (2001)
327 Ill. App.3d 153
261 Ill.Dec. 381
In re D.P. (The People of the State of Illinois, Petitioner-Appellee,
v.
Jesse C., Respondent-Appellant).
No. 1-00-0529.
Appellate Court of Illinois, First District, Fifth Division.
December 28, 2001.
*352 Rita A. Fry, Public Defender of Cook County, Chicago (Assistant Public Defender Diane Slocum, of counsel), for Appellant.
Richard A. Devine, State's Attorney of Cook County, Chicago (Assistant State's Attorneys Renee Goldfarb, Kenneth T. McCurry and Eve Reilly, of counsel), for Appellee.
Justice QUINN delivered the opinion of the court:
On June 15, 1999, the State filed a petition for adjudication of wardship alleging that D.P., a minor, was both neglected and abused by his mother and respondent. Respondent made two motions to continue the hearing until the outcome of his pending criminal trial arising from respondent's beating of the minor. The trial court denied both motions. Following an adjudicatory hearing on November 19, 1999, a finding of neglect and abuse was entered. On January 19, 2000, D.P. was adjudicated a ward of the court and the Department of Children and Family Service (DCFS) was appointed guardian.
On appeal respondent argues that his case must be remanded for a new hearing where the trial court's refusal to continue the adjudication proceedings until after his criminal trial violated his fifth amendment rights against self-incrimination.

I. Background
The minor, D.P., was born on March 13, 1999. On June 15, 1999, a petition for adjudication of wardship was filed against his father, Jesse C., and his mother, Patty P. The petition alleged that on May 25, 1999, Jesse shook D.P. violently and struck him in the face. On August 26, 1999, the juvenile court heard a pretrial defense motion to continue the adjudication proceedings until the outcome of respondent's pending criminal charges which arose from the respondent's alleged abuse of the minor. The court denied the motion, stating that the best interest of the child required the court to hold the proceedings in 90 *353 days. The court noted that it had already granted one continuance exceeding the 90 days in order to obtain D.P.'s birth records.
On November 17, 1999, just prior to the hearing on the adjudication of wardship of the minor, D.P., respondent renewed his August 26 oral motion for a continuance. Respondent again requested that the matter be heard subsequent to the resolution of the criminal charges pending against respondent. Respondent's counsel maintained that "it's important that the father has the right to participate fully in his defense in this matter involving his son." The trial court denied the motion stating "criminal cases can go on for two years* * *I will not grant the continuance for that reason." Respondent's counsel again renewed the motion on November 18, stating that Jesse would be unable to present a complete defense because the pending criminal matter prevented him from participating in his defense. The court again denied the motion. The case proceeded to hearing.
During the hearing, Detective Scott Rotkovich testified that on May 26, 1999, he was a violent crimes detective assigned to investigate the aggravated battery of a two-month-old child named D.P. Rotkovich testified that on that date, at approximately 1 a.m., he took a statement from D.P.'s father, respondent Jesse C. The statement contained the following information:
"Jesse [C.] stated that he is 26 years old and is currently residing at 4000 East 134th Street, trailer lot number 1225. Jesse currently lives at that address with his girlfriend, Patricia, and their son, [D.P.]. Jesse stated that it was a stressful situation because he had some problems in Indiana, was going to school and was barely paying the bills. Jesse remarked that Patty was immature and not `owning up' to her own responsibilities. Jesse stated that he was tired of coming home to fast food, a crying baby and a dirty crib.
Jesse was attempting to get a job as an auto mechanic but was required to pass a urine test. On the day of the incident, Jesse took Patty and [D.P.] to pick up Ray, the 5 year old nephew of a friend. Jesse wanted Ray to provide a urine sample for him. Ray refused. While Patty took Ray upstairs to his home, Jesse remained in the car with [D.P.]. When [D.P.] woke up, Jesse put the pacifier in his mouth but he spit it out and began to cry. Jesse stated that tension had built up because Patty always wanted to go with him with the baby and `a man just needs some peace of mind.' Jesse stated he wanted some relief and the only solution was to grab the baby and quiet him down. Jesse said he reached over the back seat with one hand and grabbed, yanked [D.P.] up quickly by his pajamas and pulled him into the front seat. The baby was whimpering like he was afraid.
When Patty came down, Jesse gave her the baby. Jesse stated that Patty took too long to come down and he was upset and `pissed off' because "a man has things to do for his family." Jesse began yelling at Patty in the car. When they arrived home, Jesse told Patty to put the baby down because he knew he was going to hit her. Jesse stated that he hit Patty real hard with his open right hand in the left side of her face. Jesse stated that when he went to hit her again, Patty put her hand up to block her face and then laid back. When he turned around Patty picked up the baby and that pissed him off because it looked like she was hiding behind the baby. Jesse said he went to hit Patty again, but his right hand was getting sore. Jesse stated that he swung at her *354 face with his left hand. Jesse stated that he hit the baby in the side of the head and the baby started crying.
Jesse stated he told Patty `change my son.' Jesse then told Patty to "make those phone calls" to take care of some family business. Jesse said that he went to `cool off' and when he returned home he looked in on [D.P.] Jesse stated the baby did not look right. The baby had turned blue, was not breathing and was dangling. Patty's grandmother performed CPR on [D.P.] until the ambulance came. Jesse stated that he told police officer's a `little different story' before because he wanted this to all go away."
Rotkovich testified that Assistant State's Attorney Oppenheimer read the entire statement out loud to respondent. Rotkovich testified that he, respondent, and Oppenheimer signed each page, making any corrections respondent requested.
Detective Michael Baker testified he was assigned to investigate the aggravated battery of a child, D.P. Baker testified that on May 25, 1999, at approximately 1:30 a.m. he interviewed Patricia and took her statement. The statement contained the following information:
"Patricia stated that she is 17 years old and is the mother of [D.P.]. Patty stated that she met Jesse about a year ago at a carnival. They began dating and she became pregnant.
Patty stated that a week prior to the incident Jesse was charged with burglary in Indiana. Patty said that Jesse was supposed to get a urine sample to give to an advocate for a job but that he was worried the sample would be `dirty' because of his drug use. After attempting to get Ray to provide the sample and failing, Patty said that Jesse was really mad and told her he was going to `beat her ass' when they got home. Patty stated that Jesse punched her on the left side of the face in the car. When Patty took Ray upstairs to his home, Ray's aunt came to get Patty telling her that Jesse was shaking the baby in the car. Patty took the baby from Jesse and Jesse told her he was `really going to fuck her up.'
Patty stated that when they got home, Jesse put the baby on the couch and Jesse grabbed her by the hair and punched her in the left side of the face. Jesse told Patty to change the baby, which she did. While changing the baby, Patty said that Jesse slapped the baby really hard on the left side of the face and the baby began screaming. Patty said Jesse told her to get out of the trailer and find a phone to call public aid. Patty said she left and the police were called."
Baker testified that Assistant State's Attorney Oppenheimer read the entire statement out loud and that Patty signed each page of the statement.
D.P.'s certified medical records from Christ hospital were admitted into evidence. The records provided that when the Emergency Medical System arrived, the child was unconscious and gasping for air. It was observed that D.P. had a severe head injury, a hemorrhage and contusions. The retinal hemorrhages observed in D.P. were consistent with shaken baby syndrome. D.P. continues to suffer seizure activity and twitching in his right eye.
At the close of all the evidence, the trial court found that respondent was the perpetrator of the abuse, creating a substantial risk to the minor. The court found that both Patricia and the respondent had neglected D.P. and subjected him to an injurious environment.
*355 Immediately prior to the dispositional hearing on January 19, 2000, respondent's counsel renewed her objections stated before the adjudication hearing of November 18, 1999. Counsel stated that "because he has a fifth amendment right that in the proceeding which took place on the last court date was in effect basically a one sided proceeding because we did not want to waive Mr. [C.'s] constitutional right." The court took judicial notice of the objection. At the dispositional hearing, Craig Gogins testified that he is the assigned DCFS caseworker for the minor D.P. Gogins stated that D.P. was currently placed in a medical facility in very critical condition. Gogins testified that D.P. has a frontal bilateral subdural haematoma, has lost sight in both eyes, has almost no hearing at all and is still being fed through tubes in his stomach. Gogins stated that D.P. is very irritable, doesn't like to be held and is suffering from a number of physical challenges.
Gogins testified that there were no plans to move D.P. from this facility. Gogins stated that if there were any plans, they would probably be to move him to a long-term medical facility that would be able to tend to the baby on a 24 hour basis. Gogins stated that while he referred Patty to parental skills training and counseling, Patty was not attending classes and had not visited D.P. since October. Gogins stated that respondent was currently incarcerated and was engaged in counseling at some point. Gogins believed that respondent obtained counseling through his own efforts because it was very difficult to obtain services at 26th and California. Gogins recommended that D.P. be adjudged a ward of the court.
In making its ruling, the trial court stated that, "the minor having been found abused, and all statutory prerequisites having been complied with, the court finds that the minor is adjudged a ward of the court, it being in the best interest and welfare of minor* * *It is ordered that the minor shall be placed in the custody of the DCFS guardianship administrator with the right to place the minor." Respondent now appeals.

II. ANALYSIS
Respondent is appealing from the juvenile court's findings of abuse and neglect and finding D.P. a ward of the court. On appeal, respondent argues that the juvenile court's refusal to continue the adjudicatory hearing until after his criminal case concluded was an abuse of discretion. Respondent maintains that, by refusing to continue the hearing, the court was unconstitutionally forcing him to choose between losing his parental rights or waiving his right to self incrimination.
Section 2-1007 of the Code of Civil Procedure covers requests for continuances. 735 ILCS 5/2-1007 (West 1998). It provides that: "On good cause shown, in the discretion of the court and on just terms, additional time may be granted for the doing of any act or the taking of any step or proceeding prior to judgment." 735 ILCS 5/2-1007 (West 1998). There is no absolute right to a continuance. Village of Maywood v. Barrett, 211 Ill.App.3d 775, 156 Ill.Dec. 169, 570 N.E.2d 645 (1991). It is within the juvenile court's discretion whether to grant or deny a motion for a continuance. In re K.S., 203 Ill.App.3d 586, 596, 148 Ill.Dec. 682, 560 N.E.2d 1380 (1990); In re C.L.T., 302 Ill. App.3d 770, 779, 235 Ill.Dec. 863, 706 N.E.2d 123 (1999). Furthermore, the denial of a request for continuance will not be grounds for reversal unless the complaining party has been prejudiced by such denial. In re M.R., 305 Ill.App.3d 1083, 1086, 239 Ill.Dec. 391, 713 N.E.2d 1241 (1999).
*356 The fifth amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. The fifth amendment permits a person to refuse to testify against himself during the criminal trial in which he is a defendant and allows him to refuse to answer questions put to him in any other civil or criminal proceedings, "where the answers might tend to incriminate her in future criminal proceedings." In re L.F., 306 Ill.App.3d 748, 753, 239 Ill.Dec. 780, 714 N.E.2d 1077 (1999). "This provision of the fifth amendment applies to the states through the fourteenth amendment." In re L.F., 306 Ill. App.3d 748, 753, 239 Ill.Dec. 780, 714 N.E.2d 1077 (1999), citing to Allen v. Illinois, 478 U.S. 364, 106 S.Ct. 2988, 92 L.Ed.2d 296.
Respondent is essentially arguing that his fifth amendment rights were violated in this case because he was prevented from testifying at the juvenile proceeding because he had a criminal case pending. We disagree. As support for his position, respondent relies on the decision in In re L.F., 306 Ill.App.3d 748, 239 Ill.Dec. 780, 714 N.E.2d 1077 (1999). In In re L.F., the trial court gave temporary custody of respondent's children to DCFS and subsequently changed the permanency goal from "return home" to "substitute care pending termination of parental rights" following the death of a nonbiological foster child, D.M., who was in respondent's care. Respondent argued that her fifth amendment right against self-incrimination was violated when the trial court changed the permanency goal because she would not comply with DCFS's requirement that she admit that she was responsible for D.M.'s death. The appellate court noted that this was a case of first impression in Illinois. After looking to other states for guidance, the court recognized that there was a very fine, but important, distinction between taking steps to terminate parental rights based specifically on a refusal to waive a right against self-incrimination and doing so based upon a parent's failure to comply with an order for meaningful therapy. The cases that the court examined from other jurisdictions found that "it is constitutionally impermissible to order a parent to choose between losing her parental rights or waiving her right to self-incrimination." In re L.F., 306 Ill.App.3d at 753, 239 Ill.Dec. 780, 714 N.E.2d 1077; see In re Clifford M., 6 Neb.App. 754, 577 N.W.2d 547 (1998); Mullin v. Phelps, 162 Vt. 250, 647 A.2d 714 (1994); In re Welfare of J.G.W., 433 N.W.2d 885 (Minn.1989); In re Welfare of J.W., 415 N.W.2d 879 (Minn. 1987).
In applying those holdings, the court in In re L.F. stated that the record showed that the respondent was being asked to admit to a crime. "The DCFS goal in question read, `Mrs. [F] will acknowledge responsibility for the maltreatment of the child in her care.'" In re L.F., 306 Ill. App.3d at 754, 239 Ill.Dec. 780, 714 N.E.2d 1077. The court reasoned that the trial court had deemed insufficient respondent's admission that she was responsible for the death of D.M. because his safety was entrusted to her: therefore, the only other admission that would be held satisfactory would be a full admission of her involvement in the crime. "That admission could be used against her in a subsequent criminal proceeding." In re L.F., 306 Ill.App.3d at 754, 239 Ill.Dec. 780, 714 N.E.2d 1077. The court held that the trial court violated the respondent's right against self-incrimination. The court further noted that the reasoning employed in the case applied to both permanency review hearings as well as termination of parental rights hearings. In re L.F., 306 Ill.App.3d at 753-54, 239 Ill.Dec. 780, 714 N.E.2d 1077.
*357 The case at bar is directly distinguishable. Respondent has failed to demonstrate sufficient facts to establish a constitutional violation. First, respondent does not point to any instance during his adjudication hearing where he was required to admit guilt. The record demonstrates that respondent was not compelled to incriminate himself during the proceeding. In In re L.F., the respondent was told that unless she admitted to killing the foster child in her care, she would not get custody of her children. Here, no one ever suggested that respondent repeat his confession to the juvenile court. Respondent's argument that he might hypothetically have been compelled to incriminate himself if he had chosen to take the stand is unconvincing. As the court in People v. Becker, 315 Ill.App.3d 980, 1000, 248 Ill. Dec. 696, 734 N.E.2d 987 (2000), noted, "[t]he standard for application of the fifth amendment privilege has been whether the person claiming it is confronted by substantial and real, not merely trifling or imaginary, hazards of incrimination." Respondent is speculating that, had he taken the stand, statements would be generated that might possibly be used to incriminate him in a subsequent criminal proceeding. "Such speculation cannot support a claim of standing or establish violation of the privilege against compulsory self-incrimination." People v. Becker, 315 Ill.App.3d at 1001, 248 Ill.Dec. 696, 734 N.E.2d 987.
Second, the respondent was not prevented from testifying at the juvenile proceeding in any way. As respondent's reply brief accurately states, respondent's decision not to testify was purely a matter of strategy. It is not an abuse of discretion for trial courts to refuse to stay civil proceedings because one of the parities has chosen to employ a certain strategy in a pending criminal case. As in cases in which a trial court has made an initial ruling that a defendant's prior convictions are admissible for potential impeachment if defendant takes the stand, the decision to testify is still ultimately in the defendant's discretion. Criminal courts have held that where a trial court's ruling on the admissibility of defendant's prior convictions was proper, defendant's decision not to testify does not implicate defendant's fifth amendment rights but remains a matter of trial strategy. People v. Leonard, 83 Ill.2d 411, 423, 47 Ill.Dec. 353, 415 N.E.2d 358 (1980); People v. Johnson, 97 Ill.App.3d 1055, 1069, 53 Ill.Dec. 402, 423 N.E.2d 1206 (1981).
Respondent's citation to the cases discussed by the court in In re L.F., 306 Ill.App.3d 748, 239 Ill.Dec. 780, 714 N.E.2d 1077, offers no additional support for his argument. As the State correctly asserts, those cases involved situations where the respondents were required to make admissions of abuse in order to retain parental rights. See In re Clifford M., 6 Neb.App. 754, 577 N.W.2d 547; Mullin v. Phelps, 162 Vt. 250, 647 A.2d 714; In re Welfare of J.G.W., 433 N.W.2d 885; In re Welfare of J.W., 415 N.W.2d 879. For example, In re Welfare of J.W., after removing J.W. and A.W. from their parents' care, the trial court ordered a treatment plan where respondents were required to explain to a psychologist the death of their two-year-old nephew who was in their care. The order provided that J.W. and A.W. remain in foster care until the parents completed the treatment plan. In holding that the order violated the parents' fifth amendment rights, the court noted "when a state compels testimony by threatening to inflict potent sanctions unless the constitutional privilege is surrendered, that testimony is obtained in violation of the fifth amendment." In re Welfare of J.W., 415 N.W.2d at 882, citing Lefkowitz v. Cunningham, 431 U.S. 801, 805, 97 S.Ct. 2132, 2135, 53 L.Ed.2d 1, 7 (1977). The court further *358 noted that the threat must be real and imminent. In re Welfare of J.W., 415 N.W.2d at 882. As we have previously discussed, the respondent in this case was not threatened with termination of his parental rights if he did not admit his guilt of the abuse of D.P.
Furthermore, the trial court did not abuse its discretion in refusing to continue the case where the continuance would result in an unreasonable delay. There is an overwhelming government interest in expediting these adjudicatory proceedings to "act in a just and speedy manner to determine the best interests of the minor, including providing for the safety of the minor." 705 ILCS 405/2-14(a) (West 1998). When evaluating whether due process requires a trial court to continue the proceedings in a parental rights termination case, a reviewing court may consider the governmental interests affected by a delay in the proceedings. In re M.R., 316 Ill.App.3d 399, 402, 249 Ill.Dec. 325, 736 N.E.2d 167 (2000). In this type of proceeding, a delay imposes a serious cost on the function of government, as well as intangible costs to the lives of the children involved. In re M.R., 316 Ill.App.3d at 403, 249 Ill.Dec. 325, 736 N.E.2d 167. "These considerations are so important that, even if her or his absence from the hearing is involuntary, a parent's right to due process is not violated when the conditions preventing the parent's presence are likely to continue indefinitely." In re J.P., 316 Ill.App.3d 652, 661, 249 Ill.Dec. 974, 737 N.E.2d 364 (2000).
Our supreme court recently addressed how important it is for juvenile courts to have the powers necessary to act in an expeditious manner. In In re D.S., No. 88460, 198 Ill.2d 309, 261 Ill.Dec. 281, 763 N.E.2d 251 (2001), they held:
"In instances where, as here, reunification between a minor and her family is delayed or fails, section 1-2(1) of the Act directs the circuit court to select `the best available placement to provide permanency for the child.' 705 ILCS 405/1-2(1) (West 1998). Indeed, the provisions of the Juvenile Court Act would be rendered meaningless and the functions of the juvenile court would be nullified if the court were powerless to effectuate the permanency goal it found to be in a minor's best interests. A clear example is provided by the matter at bar: if the circuit court does not have the statutory duty and authority to effectuate the permanency goal found to be in the best interests of D.S., it is conceivable that the future status of D.S. could remain in limbo until the time, if ever, the State decides to prosecute the termination petition. As we have recently observed in In re D.L., [191 Ill.2d 1, 13, 245 Ill.Dec. 256, 727 N.E.2d 990 (2000),] because `it is not in [a minor's] best interests for his status to remain in limbo for an extended period of time,' the circuit court should `consider, in an expedited manner, cases involving [such children], so that the minors whose futures are at stake in [juvenile] proceedings can obtain a prompt, just, and final resolution of their status.'" In re D.S., slip op. at 15-16, 198 Ill.2d at 327-28, 261 Ill.Dec. 291, 763 N.E.2d 261.
While not binding upon this court, the decision in Wirtz v. Wirtz, No. 99-CA-57, 2000 WL 1486652 (Ohio App. 7th Dist. 2000), is instructive on this point. In Wirtz, Debbie Wirtz filed a petition for a civil protection order in the domestic relations divisions of the trial court. The petition alleged that her husband, Jerry Wirtz, attempted to hit her with his van. A hearing on the petition was held in which Debbie testified and was cross-examined. *359 At the close of her case, Jerry orally moved for a continuance pending the resolution of criminal domestic violence charges against him arising from the same occurrence. The magistrate denied the motion stating that a delay for the reasons proffered by Jerry would be unreasonable because the criminal matter could proceed for several months. The appellate court affirmed the magistrate's denial. The court noted that a major matter for a trial court to consider is the length of the continuance and whether it would be reasonable. The court stated that the relevant statute in that case clearly contemplated limited durations for civil protection orders. "Permitting [Jerry] to delay a full hearing could well tread upon the limitations imposed by statute." Wirtz v. Wirtz at * 3. Based upon the unreasonableness of the delay, the court held that the trial court did not abuse its discretion in denying the motion.
In the case at bar, the trial court denied respondent's motion, specifically finding that granting the continuance would result in an unreasonable delay. This case was filed on June 15, 1999. When respondent originally requested a continuance in this case on August 26, 1999, the court stated that the "best interest of the child requires that we hold this (within) 90 days." The court noted that it had already continued the case beyond 90 days in order to obtain necessary records. The court went on to state that it would not "under any circumstances continue the case until after the criminal case." The court again stated on November 17th that "criminal cases can go on for two years* * *I will not grant a continuance for that reason." The trial judge heard defense counsel's arguments regarding the basis for continuing the hearing, gave it proper consideration, and denied it. In doing so the court properly considered the likely length of delay that would be required. The trial court properly indicated its concerns with a delay that could last years. In light of the fact that "[i]n making decisions affecting the lives of young children, we must use extreme caution to protect their best interests in every way possible," the trial court did not abuse its discretion in finding the potential delay unreasonable. In re C.M.J., 278 Ill.App.3d 885, 892, 215 Ill.Dec. 487, 663 N.E.2d 498 (1996).
We also note that where a defendant in a criminal case wishes to proceed on that criminal case prior to proceeding in a contemporaneously pending noncriminal proceeding, that defendant has a right to demand a speedy trial in his criminal case and he must receive that trial within 120 days of the demand if he is in custody or 160 days if he is not in custody. 725 ILCS 5/103-5(a),(b) (West 2000). Here, the defendant chose not to make any such demand. The parties agree that at the time of oral argument in this case (October 4, 2001), the criminal case was still pending and pretrial motions had not yet been heard.
Therefore, we hold that while the pendency of a criminal case may be considered by a juvenile court in ruling on a motion for continuance, it is still within the court's discretion to grant or deny a continuance. 735 ILCS 5/2-1007 (West 1998). The pendency of a criminal case does not, by itself, outweigh the factors that support proceeding in the juvenile case.
Accordingly, for the foregoing reasons, we affirm the decision of the trial court in denying respondent's request for a continuance.
Affirmed.
GREIMAN and REID, JJ., concur.