*In re* L.F. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Loreaca F., Respondent-Appellant).

Third District    No. 3—98—0745

Opinion filed July 19, 1999.

G. Edward Murphy and Joseph M. Borsberry, both of Reynolds, Murphy & Associates, P.C., of Peoria, for appellant.

Kevin W. Lyons, State's Attorney (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Prosecutor's Office, of counsel), and Susan K. Lucas, both of Peoria, for the People.

Floyd C. Dailey, of Law Office of Floyd C. Dailey, of Peoria, guardian *ad litem*.

JUSTICE SLATER delivered the opinion of the court:

On August 20, 1997, the minors, L.F., R.F., P.F., L.D.F. and I.F., were adjudicated neglected based on the death of D.M., a foster child of the respondent-mother, Loreaca F. 705 ILCS 405/2—3(b) (West 1996). All of the minors are the respondent's biological children except I.F., who was also a foster child.[1] After a shelter care hearing, the Department of Children and Family Services (DCFS) was given temporary custody of the biological children, and I.F. was given to a child placement organization. At the second permanency review hearing, the trial court changed the permanency goal from "return home" to "substitute care pending termination of parental rights." In this appeal, the respondent argues that: (1) the trial court violated her fifth amendment right against self-incrimination when it changed the permanency goal because she would not admit that she was responsible for the death of D.M.; and (2) the trial court's finding that she did not make reasonable efforts was against the manifest weight of the evidence. We agree that the respondent's fifth amendment right against self-incrimination was violated, and we therefore reverse this case and remand for further proceedings.

---

[1]Roger F., the minors' biological father, was also a subject of this neglect petition. However, he is not a party to this appeal and we will not discuss his involvement in this case.

At the adjudication hearing, Cheryl Moore, a DCFS investigator, testified that on June 13, 1997, she went to the respondent's home to remove the minors after D.M. had died. As Moore was leaving with the children, the respondent said to them, "don't tell them anything."

Dr. Ken Frazer, a neuroradiologist, testified that he examined D.M. after his death. According to Frazer, D.M. had blood in his brain and a severe brain injury. He opined that D.M. had a subarachnoid hemorrhage and a subdural hematoma. He explained that these findings indicated that D.M.'s injuries were caused by blunt force to the head and the injuries were similar to those seen in "shaking-type" acceleration/deceleration injuries of the head. He also said that D.M.'s injury did not occur from a fall.

Dr. Robert Cruse, a pediatric neurologist, testified that D.M. suffered from a subarachnoid hemorrhage, hemorrhages in the back of the eyes, and increased intercranial pressure. Dr. Cruse believed that the injuries were those of a shaken child.

Detective Willie King testified that he interviewed seven-year-old L.F. about the events leading up to D.M.'s death. L.F. told King that on the day D.M. died, he had seen D.M. get a "whupping" and be shaken by his mother because D.M. had "pooped" on himself. He said that the "whupping" occurred upstairs in their home with a belt.

King also testified that he interviewed eight-year-old L.D.F. and that child told him that D.M. said "mom slapped me" on the day he died. L.D.F. told King that D.M. had a bowel movement in the car on the day he died and D.M. was told that he was going to get a "whupping" when he got home. L.D.F. said that when D.M. got home, he was bathed, cleaned up, dressed, and given a "whupping."

King said he talked to six-year-old R.F. and R.F. told him that D.M. got a "whupping" because he "pooped" on himself.

At the conclusion of the State's case, the respondent did not call any witnesses. The court found that D.M. was subject to excessive corporal punishment and that he had died at the hands of the respondent. Additionally, the court found that D.M. had no less than 22 separate incidents of scarring on his body. The court ruled that the respondent was unfit and set the case for disposition.

A disposition hearing report was submitted to the court on September 16, 1997. The report reflects that the minors said they would receive corporal punishment by the hand and belt. The court ordered the respondent to successfully complete parenting classes, psychological evaluations, and all recommended treatment, including counseling. The respondent was also ordered to not have any unsupervised contact with the minors.

Dr. Joel Eckert conducted a psychological evaluation of the respon-

dent on November 13, 1997. The respondent told Dr. Eckert that she was referred for this assessment because "the prosecution for the State said there was some shaking of the baby—they said they took some tests—and so they took my kids away." Tests performed on the respondent showed a high level of maladjustment. Dr. Eckert opined that the respondent probably engages in such behavior as lying, cheating, stealing and fighting.

Dr. Eckert also performed a child abuse potential inventory test on the respondent. The tests showed that the summary of abuse scale fell within normal limits. However, Dr. Eckert recommended that until specific circumstances of the child's death are made clear, no children be returned to the respondent.

On December 30, 1997, DCFS submitted a client service plan to the court. The plan indicated that the respondent's progress toward a permanency goal of "return home" was unsatisfactory due to her failure to address and resolve the death of D.M. The service plan indicated that the respondent participated in parenting classes and demonstrated the knowledge of effective parenting techniques.

DCFS submitted a permanency review report on May 12, 1998, which showed that the respondent had completed parenting classes. Suzanne Jost, a licensed clinical social worker retained by the respondent, reported that the respondent had acknowledged that she was responsible for D.M.'s overall physical and emotional health. However, she denied that she shook D.M. severely or took any other action that would cause shaken baby syndrome. Therefore, DCFS noted that she had made no progress toward the goal of accepting responsibility for D.M.'s death. The report also noted that the respondent continued to deny any responsibility for the other traumas to D.M.'s body.

A permanency review hearing was held on May 19, 1998. At the hearing, Scott Hassett, a caseworker for Catholic Social Services, testified that the respondent had successfully completed parenting classes and her psychological evaluation. However, Hassett noted that he would object to the goal of "return home" of the children because there was no resolution surrounding the death of D.M. Hassett also said the respondent never acknowledged the 22 scars and bruises on D.M.'s body. The respondent told Hassett that D.M. died because he was sick.

Suzanne Jost testified that the respondent has acknowledged responsibility for D.M. because he was in her care, but that she did not acknowledge any direct harm to D.M. The respondent told Jost that she took no direct action on her part to cause any harm to D.M. Jost said that the respondent had said nothing to her that would lead Jost to believe that the respondent had harmed D.M. or that she was

anything less than a caring parent who was struggling. In Jost's opinion, there was no risk to the respondent's children, and she believed that the children should be returned to the respondent's care. She noted that she had never met the respondent's children.

On cross-examination, Jost admitted that she was retained by the respondent on a private basis and the respondent was her client. She said she had not received or reviewed any of D.M.'s medical reports. She also conceded that it was essential to a mental healing process that a person acknowledge his or her responsibility for some direct harm that was caused.

On May 19, 1998, the court entered a permanency review order that listed the permanency goal "return home within a year" as inappropriate, and the new goal was set as "return home pending status hearing." According to the court, it selected the goal because the respondent had not addressed the issue of why her children had been removed from her care. The court ordered the respondent to comply with DCFS and the terms of the service plans or risk termination of parental rights.

On June 9, 1998, DCFS created a service plan which showed the goal of "return home pending status review" as unsatisfactory because the respondent would not address why the children were not in her care.

On August 17, 1998, the court conducted another permanency review hearing. At the hearing, the trial court reviewed the June 9, 1998, service plan, a status report from Catholic Social Services, and an addenda. No other formal evidence was presented. The respondent's counsel argued that according to DCFS, the respondent had complied with every item listed on the service plan except for No. 6. That item read that the respondent "will acknowledge responsibility for the maltreatment of the child in her care." Respondent's counsel argued that the respondent had even complied with this item by admitting that she was responsible for the child's death since she was D.M.'s foster parent, even though she did not directly say that she shook the baby and caused his death. Counsel also argued that the fifth amendment protected the respondent from having to admit that she committed a criminal act or risk having her parental rights terminated.

After hearing arguments, the court noted that this was a civil proceeding, and the court found by a preponderance of the evidence that the respondent caused D.M.'s death. It said that the fact that its ruling might collaterally affect someone's decision in a criminal proceeding did not give the court any concern about violating the respondent's constitutional rights. It said that the respondent's rights were not being infringed by the court or DCFS because "we're not re-

ally talking about admitting a crime." The court noted that the issue at hand was not one of forcing a parent to admit to a crime in any type of grand jury or other incriminatory stage. Therefore, the court ordered the permanency goal to be changed to "substitute care pending termination of parental rights." It said it selected that goal because of substantial noncompliance with the court's order toward the "return home" goal. Finally, the court said that the respondent's failure to admit responsibility for D.M.'s death was a continued blanket denial in the face of strong medical evidence and that she was not making reasonable efforts toward the return of her children.

The respondent first argues that her fifth amendment right against self-incrimination was violated when the trial court changed the permanency goal to "substitute care pending termination of parental rights" because she would not admit that she was responsible for D.M.'s death.

■ The fifth amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. This provision of the fifth amendment applies to the states through the fourteenth amendment. *Allen v. Illinois*, 478 U.S. 364, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986). The fifth amendment privilege not only permits a person to refuse to testify against herself during a criminal trial in which she is a defendant, but also allows her to refuse to answer questions put to her in any other proceeding, civil or criminal, where the answers might tend to incriminate her in future criminal proceedings. *Allen v. Illinois*, 478 U.S. 364, 92 L. Ed. 2d 296, 106 S. Ct. 2988 (1986). This case is one of first impression in Illinois. Therefore, we have looked to other states for guidance and are persuaded by the reasoning of the Minnesota Supreme Court as well as the appellate courts of Nebraska and Vermont. See *In re Clifford M.*, 6 Neb. App. 754, 577 N.W.2d 547 (1998); *Mullin v. Phelps*, 162 Vt. 250, 647 A.2d 714 (1994); *In re Welfare of J.G.W.*, 433 N.W.2d 885 (Minn. 1989); *In re Welfare of J.W.*, 415 N.W.2d 879 (Minn. 1987). Those courts held that there is a very fine but important distinction between taking steps to terminate a parent's rights based specifically on a refusal to waive a right against self-incrimination and doing so based upon a parent's failure to comply with an order for meaningful therapy. They found that it is constitutionally impermissible to order a parent to choose between losing her parental rights or waiving her right to self-incrimination. *In re Clifford M.*, 6 Neb. App. at 765, 577 N.W.2d at 554; *Mullin*, 162 Vt. at 268, 647 A.2d at 724; *In re J.G.W.*, 433 N.W.2d at 886; *In re J.W.*, 415 N.W.2d at 883.

■ We note that those cases dealt with the termination of parental

rights instead of a permanency review hearing, but we believe the rationale is the same. In our case, the trial judge incorrectly ruled that the respondent's admission did not violate her rights because the hearing was civil in nature and the judge was not asking her to admit to a crime. The record in fact shows that the respondent was being asked to admit to a crime. The DCFS goal in question read, "Mrs. [F] will acknowledge responsibility for the maltreatment of the child in her care." The respondent had already admitted that she was responsible for D.M.'s death because his safety was entrusted to her as a foster mother. Since the trial court held that admission insufficient, the only other admission that would be deemed satisfactory would be a full admission of her involvement in the crime. That admission could be used against her in a subsequent criminal proceeding. Therefore, we find that the trial court violated the respondent's right against self-incrimination when it changed the permanency goal based on her failure to comply with the DCFS goal in question.

Based upon our ruling, we need not address the respondent's next contention that the trial court's ruling was against the manifest weight of the evidence. Instead, we remand this case for a new permanency hearing that does not include a service plan goal which requires the respondent to admit to being responsible for D.M.'s death.

With that said, we note that the court may, upon remand, order DCFS to structure a service plan that requires the respondent to engage in effective therapy. While DCFS may not compel therapy treatment that would require the respondent to incriminate herself, it may require the respondent to otherwise undergo treatment. Therapy, however, which does not include incriminating disclosures may be ineffective, and ineffective therapy may hurt the respondent's chances of regaining her children. As was noted in *In re J.W.*, "these consequences lie outside the protective ambit of the Fifth Amendment." *In re J.W.*, 415 N.W.2d at 883.

As a final note, we stress that our ruling in no way implies that the trial court was incorrect when it found that the respondent had failed to make reasonable efforts toward the return of her children. The respondent's satisfactory completion of the other DCFS goals does not necessarily resolve the issue of whether she is making reasonable efforts to reunite with her children.

The judgment of the circuit court of Peoria County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.

HOLDRIDGE, P.J., and HOMER, J., concur.