*In re* ANDREA F., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. T.F., Respondent-Appellant).

Second District   No. 2—01—1099

Opinion filed February 28, 2002.

O'MALLEY, J., specially concurring.

Kathryn Bischoff, of Rockford, for appellant.

Paul A. Logli, State's Attorney, of Rockford (Martin P. Moltz and Paul Benjamin Linton, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Gary J. Golian, of Department of Children & Family Services, of Rockford, guardian *ad litem*.

JUSTICE BYRNE delivered the opinion of the court:

Respondent, T.F., appeals the judgment of the circuit court of Winnebago County adjudicating him an unfit parent, terminating his parental rights to his minor daughter, Andrea, and appointing the Department of Children and Family Services (DCFS) guardian of the minor with the power to consent to her adoption.

On appeal, respondent argues that (1) the trial court's adjudication of unfitness was against the manifest weight of the evidence; (2) the trial court's failure to admonish respondent that his failure to co-

operate with DCFS services could result in the termination of his parental rights violated section 1—5(3) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1—5(3) (West 1996)); and (3) the trial court violated his fifth amendment right not to incriminate himself because the findings of unfitness were improperly based upon respondent's refusal to admit that he sexually abused Shannon H.

We hold that the court's lack of a complete admonition violated the Act, denying respondent a fair determination of his parental rights. Therefore, without deciding respondent's other contentions of error, we reverse the findings of parental unfitness and the order terminating respondent's parental rights, and we remand the cause for further proceedings.

The following facts are relevant to the disposition of the appeal. In November 1995, the State filed a petition alleging that Andrea was abused by her father, respondent, and that she was neglected and in an injurious environment because respondent placed her at risk of harm when he sexually abused Andrea's half-sister, Shannon H. At a preliminary hearing, the trial court read the allegations of the petition for abuse and neglect and explained the following to respondent:

> "If either one of those allegations are [sic] proven to be true, the children could be declared to be neglected or abused minors.
>
> If they're found to be abused minors, the Court must indicate [who] had caused the abuse and then determine the fitness of that person to have contact with, guardianship or custody of the minor.
>
> The Court can if either allegation is found to be true declare the children to be wards of the Court until they reach the age of 19.
>
> Basically, that enables the Court to enter orders requiring that the parents participate in counseling services intended to eliminate any future risk of the minors, to minimize any harm that's occurred to the minors in the past.
>
> The Court can if it finds [the] parents are unable to adequately care for, protect, train, discipline the minors, the Court can remove the minors from the custody of one parent, place with another parent or remove from the custody of both parents, place with a relative or place under the guardianship of DCFS."

The court further explained to the parents their right to be present during the hearings, to question witnesses at trial, and to have a lawyer represent them. The court never advised respondent that his parental rights could be terminated if he failed to cooperate with DCFS or comply with the recommended service plans.

On July 30, 1996, at the close of the adjudication hearing, the court found Andrea and Shannon H. abused and neglected. The trial court denied the motion to reconsider and found that it would be in the minors' best interest to declare them to be wards of the court

until they reached the age of 19, unless the court terminated the order. The court ordered the guardianship and custody of Andrea to her mother. Respondent was allowed visitations with Andrea, to be supervised at the discretion of DCFS. The court further ordered:

"[T]he mother, father and—actually, the father and minors cooperate with [DCFS] and shall participate in any and all counseling recommended by DCFS or its contracting agency, which shall include but not be limited to sexual offense counseling, protective services assessment counseling, victimization counseling, alcohol and substance abuse counseling."

The court did not advise respondent that he risked losing his parental rights if he failed to cooperate with DCFS or comply with the recommended service plans.

Respondent appealed the judgment of the trial court. We found the evidence sufficient to support the trial court's finding that Shannon H. had been abused and that Andrea was neglected and in an injurious environment because respondent had sexually abused Shannon H. However, we found the evidence insufficient to support the finding that respondent abused Andrea. *In re A.F.*, No. 2—96—1050 (1997) (unpublished order under Supreme Court Rule 23).

A modified order to reflect the Rule 23 disposition was entered by the trial court on May 11, 1998. Respondent filed a motion to modify the service plan to reflect the decision of the Rule 23 order, asking the court to permit respondent to visit with Andrea. On October 28, 1998, following the hearing on the motion to modify the disposition, the court ordered that supervised visits between respondent and Andrea could occur at the caseworker's discretion and that respondent must fully cooperate with counseling for these visits to occur. The court did not admonish respondent that his failure to cooperate could result in the termination of his parental rights.

On August 11, 2000, the State filed a petition for the termination of parental rights and the power to consent to adoption. The petition alleged that respondent was unfit because he failed to maintain a reasonable degree of interest, concern, or responsibility for Andrea; that he neglected Andrea in a continuous and repeated manner; and that he failed to make reasonable efforts to correct the conditions that were the basis of removal or to make reasonable progress toward her return home within nine months of the adjudication. On May 23, 2001, Andrea's mother voluntarily surrendered her parental rights. On May 30, 2001, following a hearing, respondent was found to be unfit and, thereafter, the court determined that it was in the best interests of the minor to terminate respondent's parental rights and to authorize DCFS to consent to Andrea's adoption. Respondent timely appeals.

■ We first address the appropriate standard of review. Ordinarily, a trial court's finding as to fitness is afforded great deference on review. *In re M.H.*, 196 Ill. 2d 356, 361 (2001). However, in the present case, the question presented, whether the trial court was required to admonish respondent that he must cooperate with DCFS services or risk the termination of his parental rights, is a question of law and will be reviewed *de novo. In re M.H.*, 196 Ill. 2d at 361.

■ Section 1—5 of the Act in effect at the time of the initial adjudication of neglect and abuse and at the time of the original dispositional order in July 1996, provided, in pertinent part:

"Rights of parties to proceedings.

(1) *** [T]he minor who is the subject of the proceeding and his parents *** have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also *** the right to be represented by counsel.

\* \* \*

(3) *** At the first appearance before the court by the minor [and] his parents *** the court shall explain the nature of the proceedings and inform the parties of their rights under the first 2 paragraphs of this Section." 705 ILCS 405/1—5 (1), (3) (West 1996).

Although there is no specific requirement under the Act that the courts admonish the parents regarding the termination of their parental rights, it is clear that the rights set forth in section 1—5(3) would be meaningless if the parents are unaware of them. The interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized. *Troxel v. Granville*, 530 U.S. 57, 65, 147 L. Ed. 2d 49, 56, 120 S. Ct. 2054, 2060 (2000). While Illinois courts recognize a parent's liberty interest in raising children, the courts also recognize that parental rights must sometimes be terminated. *M.H.*, 196 Ill. 2d at 362-63.

■ The legislature balanced the parents' liberty interest in raising their children with those situations in which the best interests of the children sometimes establish that parental rights must be terminated. Article II of the Act (705 ILCS 405/2—1 *et seq.* (West 1996)) sets out the procedures for adjudicating a petition that alleges that a minor is abused, neglected, or dependent (705 ILCS 405/2—3 (West 1996)). After the entry of the determination (705 ILCS 405/2—21(1) (West 1996)), the court must hold a dispositional hearing (705 ILCS 405/2—22(2) (West 1996)). A dispositional hearing serves a crucial purpose in allowing the trial court to decide what further actions are in the best interests of a neglected, abused, or dependent minor. It also gives the parents fair notice of what they must do to retain their rights to their

children in the face of any future termination proceedings. *In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000). This right is "of deep human importance and will not be lightly terminated." *In re Paul*, 101 Ill. 2d 345, 351-52 (1984). Given the importance of a dispositional hearing to the fairness of any future termination proceedings, we believe that the legislature intended that the trial courts inform the parents of all of their rights to the proceedings, including what they must do to retain their parental rights to their children.

We find support for this conclusion in *In re Smith*, 77 Ill. App. 3d 1048 (1979), and *In re Moore*, 87 Ill. App. 3d 1117 (1980). Both cases were based on the 1977 version of section 1—20 of the Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—20). Section 1—20 provided that, at the first appearance before the court by the minor's parents, "the court shall explain the nature of the proceedings and inform the parties of their rights" (Ill. Rev. Stat. 1977, ch. 37, par. 701—20(3)), including the "right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records," and to be represented by the public defender or appointed counsel (Ill. Rev. Stat. 1977, ch. 37, par. 701—20(1)).

In *Smith*, the mother consented to the minor being placed in the temporary custody of DCFS until the upcoming date of the adjudicatory hearing. The trial court informed the mother that she was entitled to an attorney at the hearing, and the mother acknowledged her right but chose not to exercise it. After the adjudicatory hearing, the court found that the minor was neglected and ordered that the minor be made a ward of the court. Following the dispositional hearing, the court ordered that the child be removed from the custody of his parents and placed in the permanent custody of DCFS. On appeal, the mother contended that the court erred by failing to advise her of her rights and of the nature of the juvenile court proceedings as required by section 1—20(3) (Ill. Rev. Stat. 1977, ch. 37, par. 701—20(3)).

Although there was little or no authority as to what would constitute adequate admonitions under this section, the appellate court found that clearly the statutory language imposed a mandatory duty on the trial court to inform the parties of the nature of the proceedings. *Smith*, 77 Ill. App. 3d at 1053. The court held that, in cases in which the State seeks an adjudication of neglect or where a child is otherwise in need of supervision, the parents, at the very minimum, must be informed that their child may become a ward of the State and that, upon such a determination, they may lose the custody of their child. *Smith*, 77 Ill. App. 3d at 1053. The court believed that, without these basic admonitions, the other procedural rights, including the right to counsel, would have little meaning. *Smith*, 77 Ill. App. 3d at

1053. Because the mother was unaware that her son could be taken from her, she was unprepared to challenge the evidence that the interest of the child would best be served by keeping him in foster care. *Smith*, 77 Ill. App. 3d at 1054. Accordingly, the court held that the trial court erred in failing to inform the mother at her first appearance that she could be deprived of the custody of her son at the dispositional hearing. *Smith*, 77 Ill. App. 3d at 1053.

In *Moore*, the trial court found the minor to be neglected and, following the dispositional hearing, awarded custody to the maternal grandmother. The mother, who had admitted to neglect, contended on appeal that she was denied due process when the trial court failed to explain to her the nature of the adjudicatory proceedings and that this failure violated section 1—20 of the Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—20). The court was unable to determine from the record whether the mother knew she had the right to contest the allegations of neglect and adjudication of wardship. The court also was unable to determine whether the mother was aware of the nature of the adjudicatory proceedings or that she could lose custody of her child. *Moore*, 87 Ill. App. 3d at 1121. Rejecting the State's argument that the lack of an admonishment of rights and an explanation of the proceedings at the adjudicatory stage was not prejudicial, the court believed that the admonishment was necessary because "[i]f the parent is not aware of the right to contest the petition's allegations of neglect, an admission of neglect might well be prejudicial, particularly where the parent did not know and was not informed that permanent custody of the child could be lost at the dispositional hearing as a result of that very admission." *Moore*, 87 Ill. App. 3d at 1122.

The 1977 version of section 1—20(3) required a trial court to "explain the nature of the proceedings and inform the parties of their rights" at the parents' first court appearance. Ill. Rev. Stat. 1977, ch. 37, par. 701—20(3). The courts in *Smith* and *Moore* held that section 1—20(3) required a trial court to admonish the parents that they might lose custody of their children. We conclude that a similar admonition was required at the July 1996 adjudicatory hearing in this case because the 1996 version of section 1—5(3) (705 ILCS 405/1—5(3) (West 1996)) is substantially similar to the 1977 version of section 1—20(3).

Moreover, we believe that the admonition to the parent is even more important in the present case, where the parent could lose his parental rights. Custody can be modified. In contrast, a termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of custodial and noncustodial rights. *In re P.F.*, 265 Ill. App. 3d 1092, 1101 (1994).

Significantly, through Public Act 90—28 (Pub. Act 90—28, § 10—20, eff. January 1, 1998), the legislature amended several sections of the Act, expressly mandating the trial court to admonish the parents that they "must cooperate with [DCFS], comply with the terms of the service plans, and correct the conditions that require the child to be in care, *or risk termination of their parental rights*" (emphasis added) (705 ILCS 405/1—5(3), 2—22(6) (West 1998); see 705 ILCS 405/2—21(1) (West 1998)). We note that this requirement was in effect at the time of the hearing on the motion to modify the disposition on October 11, 1998, when the trial court had a second opportunity to explicitly inform respondent that he risked the termination of his parental rights, but failed to do so.

■ The State's only reply to respondent's argument is found in a footnote in the appellee's brief, in which the State asserts that the trial court properly admonished respondent on July 30, 1996, and October 28, 1998, when it warned respondent that it was extremely important that he cooperate with DCFS services. The State asserts that respondent was aware of the risk because respondent never testified at the fitness hearing that he did not understand the consequences of noncooperation or that his attorney had not explained those consequences to him. We find this argument disingenuous at best. Here, the record fails to disclose that respondent was ever admonished that he · could lose his parental rights to his child if he failed to cooperate with DCFS and comply with the service plans. Without a warning of the risks, at least by the time of the dispositional hearing, respondent could not appreciate the importance of compliance. We cannot assume that the parent is aware that he could lose his parental rights if he fails to cooperate and comply with the directives of the trial court; the legislature placed the duty on the trial court to inform the parent at the adjudicatory and dispositional stages of the proceedings.

We are mindful that the primary concern expressed by the Act is the best interests of the child. Nor do we ignore that the child has a right to a stable environment and finality. However, we believe that the due process right of the parent outweighs our desire for conclusiveness. Moreover, it is clear that the legislature believes that the parents' right to fair notice is a necessary element of the minor's welfare.

Accordingly, under the circumstances here, we hold that the trial court's failure to comply with the Act necessitates a reversal of the finding of unfitness, the order terminating respondent's parental rights, and the judgment order awarding custody of the minor to DCFS. The cause is remanded for a new dispositional hearing pursuant to section 2—22 of the Act (705 ILCS 405/2—22 (West 1998)). Custody of the minor pending the outcome is to remain with the pres-

ent custodian or as the trial court shall otherwise determine pending the completion of the proceedings.

Based on our decision, we need not address respondent's remaining contentions other than to note that on remand the court may order DCFS to structure new service plans, including one that requires respondent to engage in effective sexual abuse therapy. However, DCFS may not compel therapy treatment that would require respondent to incriminate himself, and the court may not base its decision to terminate parental rights on respondent's failure to admit to a crime. See *In re L.F.*, 306 Ill. App. 3d 748 (1999). "[T]here is a very fine but important distinction between taking steps to terminate a parent's rights based specifically on a refusal to waive a right against self-incrimination and doing so based upon a parent's failure to comply with an order for meaningful therapy." *L.F.*, 306 Ill. App. 3d at 753.

For the foregoing reasons, the decision of the circuit court of Winnebago County is reversed, and the cause is remanded with directions.

Reversed and remanded with directions.

McLAREN, J., concurs.

JUSTICE O'MALLEY, specially concurring:

I agree that reversal is necessary because the trial court failed to advise the respondent, in the words of section 1—5(3) of the Act, that he was obligated to "cooperate with [DCFS], comply with the terms of the service plans, and correct the conditions that require the child to be in care, or risk termination of *** parental rights." 705 ILCS 405/1—5(3) (West 1998). I write to stress that the service plan designed to reunite Andrea with her father has made no progress toward curing the conditions that separated Andrea from her father; instead, it has harmed her. In fact, before the visitations that traumatized Andrea were terminated by the court because of their negative effects, the service plan was grossly inconsistent with the purposes of the governing law.

On July 2, 1996, respondent was adjudged to have sexually abused Andrea's half-sister, Shannon H., by fondling her buttocks, and to have thereby neglected Andrea because she was living with Shannon H. at the time. Andrea was removed from respondent's custody following the report of abuse. Pursuant to a service plan instituted by DCFS in August 1995, respondent was allowed weekly supervised visits during the pendency of the abuse/neglect petition. On July 30, 1996, following the adjudication of the petition, Andrea was declared a ward of the court and guardianship was placed with her mother, Connie K.

Also, respondent was allowed visitation with Andrea "supervised by DCFS per their discretion." Supervised visitation between respondent and Andrea indeed continued under the service plan.

In a December 1996 report to DCFS, Andrea's therapist, Chris Magnelia, of Family Advocate, Inc., of Rockford, wrote:

"[I]t appears Andrea *** is exhibiting post traumatic, sexual abuse related behaviors after visitation with her biological father, [respondent]. These behaviors involve trauma specific reinactment [sic], in play, recurrent distressing dreams surrounding past abuse, difficulting [sic] staying asleep, and enuretic episodes. These charateristics [sic] symptoms are no doubt being exasperated [sic] by exposure to the perpetrator of abuse."

Magnelia recommended that respondent's visits with Andrea be reduced from weekly to biweekly and noted that "further decrease in frequency may become necessary if Andrea's visitations continue to illicit [sic] further development of Post Traumatic Stress Disorder type symptomotology."

On February 11, 1997, Magnelia reported to DCFS that Andrea was no longer "displaying nightmares or bed wetting" after visitations with respondent but was continuing "to manifest considerable opposition/defiant type behaviors at home after her visits." Magnelia noted that Andrea told him during a previous counseling session that "she feels very uncomfortable when her father would hold her hand, and when he would kiss her goodbye (on the lips) during visitations with him. Andrea prefers that her father not hold her hand and that he only kisses her on the cheek when departing from visits." Magnelia recommended that Andrea's wishes concerning physical contact with her father be honored during the visits.

In a February 24, 1997, report to DCFS, Magnelia wrote:

"Andrea continues to express considerable distress and confusion in terms of having visitation with her father, [respondent]. [Respondent's] affections in terms of holding Andrea's hand and kissing her goodbye (which he was told not to do) are interrupted [sic] by Andrea as being a prelude to sexual abuse. Andrea frighteningly stated that when her father holds her hand 'I don't know if he's going to do anything more.' Andrea reported 'My dad says he loves me ... so I love him' (stated with indifference). This association of being told that one is loved by someone who has also been abusive, can be very problematic if Andrea confuses love and affection with sexual abuse, which would in turn make her more likely to be exploited in the future, by a perpetrator who exclaims [sic] love and affection, but whose behaviors are exploitative.

At this time it is recommended that visitations with [respondent] are not in the best interests of Andrea's psychological or emotional

well-being, and therefore visitations be terminated. Andrea's mistrust and feelings of vulnerability to subsequent abuse/exploitation appears to manifest itself [sic] only with her father. Andrea needs to feel safe and it is extremely important that Andrea not be exposed to an environment which continues to traumatize her."

At the hearing on the request for the termination of respondent's visitation, counsel for respondent argued that Andrea was initiating the "large majority" of physical contact during the visitations and that respondent never kissed Andrea on the lips during the visits. Observing that "a common thread throughout the reports regarding visitation is that Andrea manifests some kind of disturbed behavior at the conclusion, whether or not it be from conduct that she's initiating or not," the court entered an order terminating respondent's visitation with Andrea.

On respondent's motion, the court modified the order in October 1998 to permit supervised visits "at the discretion of the caseworker for therapeutic purposes." The court conditioned the visitation on respondent's completion of sex offender counseling. According to respondent's caseworker, Christine Johnson, a requirement of sex offender counseling was that respondent admit to having abused either Andrea or Shannon H. Respondent has never made such an admission and has never completed sex offender counseling. His visits with Andrea have not been reestablished.

At the hearing on the petition for the termination of parental rights, Johnson testified that, while she was the caseworker for respondent between June 1997 and August 2000, Andrea reported that she was "angry" with and "scared of" respondent. Andrea told Johnson that she (Andrea) was afraid to see respondent and did not want to meet him at court. Julie Rector, who became respondent's caseworker in August 2000, testified that Andrea stated in March 2001 that "she did not want to see her father because she was scared of him."

It is important to note what purposes are to be served by the governing law. "It is well settled that the purpose of the [Juvenile Court Act] is to serve the best interest of the minor." *In re Bettie Jo R.*, 277 Ill. App. 3d 401, 405 (1995). In its own words, the Act's purpose is:

"to secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; to preserve and strengthen the minor's family ties whenever possible, removing him or her

from the custody of his or her parents only when his or her safety or welfare or the protection of the public cannot be adequately safeguarded without removal." 705 ILCS 405/1—2(1) (West 1998). The Act is to be "administered in a spirit of humane concern, not only for the rights of the parties, but also for the fears and the limits of understanding of all who appear before the court." 705 ILCS 405/1—2(2) (West 1998). All procedures under the Act are to be guided by the precept that "[t]he parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the health, safety, and best interests of the child." 705 ILCS 405/1—2(3)(c) (West 1998).

The purpose of a service plan imposed in the wake of a finding of abuse or neglect is "to correct the conditions that were the basis for the removal of the child from the parent." 750 ILCS 50/1(D)(m) (West 1998). A parent's failure to make reasonable efforts toward correcting those conditions pursuant to the terms of a service plan is a basis for the termination of parental rights. See 750 ILCS 50/1(D)(m) (West 1998). The law recognizes, however, that not all attempts to reunite the minor with the parent who has been found to have neglected the minor are appropriate. Section 8.2 of the Abused and Neglected Child Reporting Act (325 ILCS 5/8.2 (West 1998)) provides in relevant part:

"Family preservation services shall be offered, where safe and appropriate, to prevent the placement of children in substitute care when the children can be cared for at home or in the custody of the person responsible for the children's welfare without endangering the children's health or safety, to reunite them with their families if so placed when reunification is an appropriate goal, or to maintain an adoptive placement." 325 ILCS 5/8.2 (West 1998).

The provisions quoted above are representative of the fact that, in all places in the Juvenile Court Act and the Abused and Neglected Child Reporting Act where the importance of reunifying the parent with the minor is emphasized, there is also the qualification that reunification, and attempts at reunification in the form of service plans, should not occur at the expense of the minor's welfare. The visitation that DCFS attempted as part of the service plan did not promote the healing of the rift between Andrea and her father. In fact, for Andrea the visits led not to an increased sense of closeness with her father but rather to bed-wetting, sleeplessness, nightmares, and emotional disturbance. Andrea is openly fearful of her father; she is suspicious even of his attempts to hold her hand. Magnelia, Andrea's therapist, offered an uncontroverted opinion that her father's professions of love accompanied by perceived attempts at abuse may cause Andrea severe emotional harm. Given the history of this case, I doubt

whether reunification is an appropriate goal; I am even more doubtful of the propriety of a plan to allow visitation between Andrea and an individual like respondent upon his confession that he abused either Andrea or Shannon H. Rehabilitation of sex offenders is a worthy goal, but in light of Andrea's profound fear and suspicion of her father and his apparent indifference throughout this case toward bettering himself as directed by DCFS and the court (*e.g.*, failing to appear in court for months at a time and failing to complete counseling for alcohol and drug abuse and domestic violence), I would think that such a confession would be decisive grounds for *dis*allowing visitation. I would urge DCFS, in formulating a service plan on remand, to take full account of the harm inflicted by the previous service plan. The Juvenile Court Act is not to be construed in favor of parents at the expense of children. See *In re K.B.J.*, 305 Ill. App. 3d 917, 922 (1999).