No. 2--01--1099

 IN THE

 APPELLATE COURT OF ILLINOIS

 SECOND DISTRICT
 _

In re ANDREA F., a Minor ) Appeal from the Circuit Court
 ) of Winnebago County,
 )
 ) No. 95--J--743
 )
(The People of the State of ) Honorable
Illinois, Petitioner-Appellee, ) Janet Clark Holmgren,
v. T.F., Respondent-Appellant). ) Judge, Presiding.

 JUSTICE BYRNE delivered the opinion of the court:
 Respondent, T.F., appeals the judgment of the circuit court of Winnebago County adjudicating
him an unfit parent, terminating his parental rights to his minor daughter, Andrea, and appointing
the Department of Children and Family Services (DCFS) guardian of the minor with the power to
consent to her adoption.
 On appeal, respondent argues that (1) the trial court's adjudication of unfitness was against
the manifest weight of the evidence; (2) the trial court's failure to admonish respondent that his
failure to cooperate with DCFS services could result in the termination of his parental rights
violated section 1--5(3) of the Juvenile Court Act (Act) (705 ILCS 405/1--5(3) (West 1996)); and (3)
the trial court violated his fifth amendment right not to incriminate himself because the findings
of unfitness were improperly based upon respondent's refusal to admit that he sexually abused
Shannon H.
 We hold that the court's lack of a complete admonition violated the Act, denying respondent a
fair determination of his parental rights. Therefore, without deciding respondent's other
contentions of error, we reverse the findings of parental unfitness and the order terminating
respondent's parental rights, and we remand the cause for further proceedings.
 The following facts are relevant to the disposition of the appeal. In November 1995, the
State filed a petition alleging that Andrea was abused by her father, respondent, and that she was
neglected and in an injurious environment because respondent placed her at risk of harm when he
sexually abused Andrea's half-sister, Shannon H. At a preliminary hearing, the trial court read the
allegations of the petition for abuse and neglect and explained the following to respondent:
 "If either one of those allegations are [sic] proven to be true, the children could be
 declared to be neglected or abused minors.
 If they're found to be abused minors, the Court must indicate [who] had caused the abuse
 and then determine the fitness of that person to have contact with, guardianship or custody of
 the minor.
 The Court can if either allegation is found to be true declare the children to be wards
 of the Court until they reach the age of 19.
 Basically, that enables the Court to enter orders requiring that the parents participate
 in counseling services intended to eliminate any future risk of the minors, to minimize any
 harm that's occurred to the minors in the past.
 The Court can if it finds [the] parents are unable to adequately care for, protect,
 train, discipline the minors, the Court can remove the minors from the custody of one parent,
 place with another parent or remove from the custody of both parents, place with a relative or
 place under the guardianship of DCFS."
The court further explained to the parents their right to be present during the hearings, to
question witnesses at trial, and to have a lawyer represent them. The court never advised
respondent that his parental rights could be terminated if he failed to cooperate with DCFS or
comply with the recommended service plans.
 On July 30, 1996, at the close of the adjudication hearing, the court found Andrea and Shannon
H. abused and neglected. The trial court denied the motion to reconsider and found that it would be
in the minors' best interest to declare them to be wards of the court until they reached the age of
19, unless the court terminated the order. The court ordered the guardianship and custody of Andrea
to her mother. Respondent was allowed visitations with Andrea, to be supervised at the discretion
of DCFS. The court further ordered that:
 "the mother, father and--actually, the father and minors cooperate with [DCFS] and shall
 participate in any and all counseling recommended by DCFS or its contracting agency, which
 shall include but not be limited to sexual offense counseling, protective services assessment
 counseling, victimization counseling, alcohol and substance abuse counseling."
The court did not advise respondent that he risked losing his parental rights if he failed to
cooperate with DCFS or comply with the recommended service plans.
 Respondent appealed the judgment of the trial court. We found the evidence sufficient to
support the trial court's finding that Shannon H. had been abused and that Andrea was neglected and
in an injurious environment because respondent had sexually abused Shannon H. However, we found the
evidence insufficient to support the finding that respondent abused Andrea. In re A.F., No. 2--96--
1050 (1997)(unpublished order under Supreme Court Rule 23).
 A modified order to reflect the Rule 23 disposition was entered by the trial court on May 11,
1998. Respondent filed a motion to modify the service plan to reflect the decision of the Rule 23
order, asking the court to permit respondent to visit with Andrea. On October 28, 1998, following
the hearing on the motion to modify the disposition, the court ordered that supervised visits
between respondent and Andrea could occur at the caseworker's discretion and that respondent must
fully cooperate with counseling for these visits to occur. The court did not admonish respondent
that his failure to cooperate could result in the termination of his parental rights.
 On August 11, 2000, the State filed a petition for the termination of parental rights and the
power to consent to adoption. The petition alleged that respondent was unfit because he failed to
maintain a reasonable degree of interest, concern, or responsibility for Andrea; that he neglected
Andrea in a continuous and repeated manner; and that he failed to make reasonable efforts to correct
the conditions that were the basis of removal or to make reasonable progress toward her return home
within nine months of the adjudication. On May 23, 2001, Andrea's mother voluntarily surrendered
her parental rights. On May 30, 2001, following a hearing, respondent was found to be unfit and,
thereafter, the court determined that it was in the best interests of the minor to terminate
respondent's parental rights and to authorize DCFS to consent to Andrea's adoption. Respondent
timely appeals.
 We first address the appropriate standard of review. Ordinarily, a trial court's finding as to
fitness is afforded great deference on review. In re M.H., 196 Ill. 2d 356, 361 (2001). However, in
the present case, the question presented, whether the trial court was required to admonish
respondent that he must cooperate with DCFS services or risk the termination of his parental rights,
is a question of law and will be reviewed de novo. In re M.H., 196 Ill. 2d at 361.
 Section 1--5 of the Act in effect at the time of the initial adjudication of neglect and abuse
and at the time of the original dispositional order in July 1996, provided, in pertinent part:
 "Rights of parties to proceedings.
 (1) *** the minor who is the subject of the proceeding and his parents *** have the right
 to be present, to be heard, to present evidence material to the proceedings, to cross-examine
 witnesses, to examine pertinent court files and records and also *** the right to be
 represented by counsel.
 * * *
 (3) *** At the first appearance before the court by the minor [and] his parents *** the
 court shall explain the nature of the proceedings and inform the parties of their rights under
 the first 2 paragraphs of this Section." 705 ILCS 405/1--5 (1), (3) (West 1996)).
 Although there is no specific requirement under the Act that the courts admonish the parents
regarding the termination of their parental rights, it is clear that the rights set forth in section
1--5(3) would be meaningless if the parents are unaware of them. The interest of parents in the
care, custody, and control of their children is perhaps the oldest of the fundamental liberty
interests recognized. Troxel v. Granville, 530 U.S. 57, 65, 147 L. Ed. 2d 49, 56, 120 S. Ct. 2054,
2060 (2000). While Illinois courts recognize a parent's liberty interest in raising children, the
courts also recognize that parental rights must sometimes be terminated. M.H., 196 Ill. 2d at 362-
63.
 The legislature balanced the parents' liberty interest in raising their children with those
situations in which the best interests of the children sometimes establish that parental rights must
be terminated. Article II of the Act (705 ILCS 405/2--1 et seq. (West 1996)) sets out the
procedures for adjudicating a petition that alleges that a minor is abused, neglected, or dependent
(705 ILCS 405/2--3 (West 1996)). After the entry of the determination (705 ILCS 405/2--21(1) (West
1996)), the court must hold a dispositional hearing (705 ILCS 405/2--22(2) (West 1996)). A
dispositional hearing serves a crucial purpose in allowing the trial court to decide what further
actions are in the best interests of a neglected, abused, or dependent minor. It also gives the
parents fair notice of what they must do to retain their rights to their children in the face of any
future termination proceedings. In re G.F.H., 315 Ill. App. 3d 711, 715 (2000). This right is "of
deep human importance and will not be lightly terminated." In re Paul, 101 Ill. 2d 345, 351-52
(1984). Given the importance of a dispositional hearing to the fairness of any future termination
proceedings, we believe that the legislature intended that the trial courts inform the parents of
all of their rights to the proceedings, including what they must do to retain their parental rights
to their children.
 We find support for this conclusion in In re Smith, 77 Ill. App. 3d 1048 (1979), and In re
Moore, 87 Ill. App. 3d 1117 (1980). Both cases were based on the 1977 version of section 1--20 of
the Act (Ill. Rev. Stat. 1977, ch. 37, par. 701--20). Section 1--20 provided that, at the first
appearance before the court by the minor's parents, "the court shall explain the nature of the
proceedings and inform the parties of their rights" (Ill. Rev. Stat. 1977, ch. 37, par. 701--20(3)),
including the "right to be present, to be heard, to present evidence material to the proceedings, to
cross-examine witnesses, to examine pertinent court files and records," and to be represented by the
public defender or appointed counsel (Ill. Rev. Stat. 1977, ch. 37, par. 701--20(1)).
 In Smith, the mother consented to the minor being placed in the temporary custody of DCFS
until the upcoming date of the adjudicatory hearing. The trial court informed the mother that she
was entitled to an attorney at the hearing, and the mother acknowledged her right but chose not to
exercise it. After the adjudicatory hearing, the court found that the minor was neglected and
ordered that the minor be made a ward of the court. Following the dispositional hearing, the court
ordered that the child be removed from the custody of his parents and placed in the permanent
custody of DCFS. On appeal, the mother contended that the court erred by failing to advise her of
her rights and of the nature of the juvenile court proceedings as required by section 1--20(3) (Ill.
Rev. Stat. 1977, ch. 37, par. 701--20(3)).
 Although there was little or no authority as to what would constitute adequate admonitions
under this section, the appellate court found that clearly the statutory language imposed a
mandatory duty on the trial court to inform the parties of the nature of the proceedings. Smith, 77
Ill. App. 3d at 1053. The court held that, in cases in which the State seeks an adjudication of
neglect or where a child is otherwise in need of supervision, the parents, at the very minimum, must
be informed that their child may become a ward of the State and that, upon such a determination,
they may lose the custody of their child. Smith, 77 Ill. App. 3d at 1053. The court believed that,
without these basic admonitions, the other procedural rights, including the right to counsel, would
have little meaning. Smith, 77 Ill. App. 3d at 1053. Because the mother was unaware that her son
could be taken from her, she was unprepared to challenge the evidence that the interest of the child
would best be served by keeping him in foster care. Smith, 77 Ill. App. 3d at 1054. Accordingly,
the court held that the trial court erred in failing to inform the mother at her first appearance
that she could be deprived of the custody of her son at the dispositional hearing. Smith, 77 Ill.
App. 3d at 1053.
 In Moore, the trial court found the minor to be neglected and, following the dispositional
hearing, awarded custody to the maternal grandmother. The mother, who had admitted to neglect,
contended on appeal that she was denied due process when the trial court failed to explain to her
the nature of the adjudicatory proceedings and that this failure violated section 1--20 of the Act
(Ill. Rev. Stat. 1977, ch. 37, par. 701--20). The court was unable to determine from the record
whether the mother knew she had the right to contest the allegations of neglect and adjudication of
wardship. The court also was unable to determine whether the mother was aware of the nature of the
adjudicatory proceedings or that she could lose custody of her child. Moore, 87 Ill. App. 3d at
1121. Rejecting the State's argument that the lack of an admonishment of rights and an explanation
of the proceedings at the adjudicatory stage was not prejudicial, the court believed that the
admonishment was necessary because "[i]f the parent is not aware of the right to contest the
petition's allegations of neglect, an admission of neglect might well be prejudicial, particularly
where the parent did not know and was not informed that permanent custody of the child could be lost
at the dispositional hearing as a result of that very admission." Moore, 87 Ill. App. 3d at 1122.
 The 1977 version of section 1--20(3) required a trial court to "explain the nature of the
proceedings and inform the parties of their rights" at the parents' first court appearance. Ill.
Rev. Stat. 1977, ch. 37, par. 701--20(3). The courts in Smith and Moore held that section 1--20(3)
required a trial court to admonish the parents that they might lose custody of their children. We
conclude that a similar admonition was required at the July 1996 adjudicatory hearing in this case
because the 1996 version of section 1--5(3) (705 ILCS 405/1--5(3) (West 1996)) is substantially
similar to the 1977 version of section 1--20(3).
 Moreover, we believe that the admonition to the parent is even more important in the present
case, where the parent could lose his parental rights. Custody can be modified. In contrast, a
termination of parental rights is a final and complete severance of the child from the parent and
removes the entire bundle of custodial and noncustodial rights. In re P.F., 265 Ill. App. 3d 1092,
1101 (1994).
 Significantly, through Public Act 90--28 (Pub. Act 90--28, §10--20, eff. January 1, 1998), the
legislature amended several sections of the Act, expressly mandating the trial court to admonish the
parents that they "must cooperate with [DCFS], comply with the terms of the service plans, and
correct the conditions that require the child to be in care, or risk termination of their parental
rights" (emphasis added) (705 ILCS 405/1--5(3), 2--22(6) (West 1998); see 705 ILCS 405/2--21(1)
(West 1998)). We note that this requirement was in effect at the time of the hearing on the motion
to modify the disposition on October 11, 1998, when the trial court had a second opportunity to
explicitly inform respondent that he risked the termination of his parental rights, but failed to do
so.
 The State's only reply to respondent's argument is found in a footnote in the appellee's
brief, in which the State asserts that the trial court properly admonished respondent on July 30,
1996, and October 28, 1998, when it warned respondent that it was extremely important that he
cooperate with DCFS services. The State asserts that respondent was aware of the risk because
respondent never testified at the fitness hearing that he did not understand the consequences of
noncooperation or that his attorney had not explained those consequences to him. We find this
argument disingenuous at best. Here, the record fails to disclose that respondent was ever
admonished that he could lose his parental rights to his child if he failed to cooperate with DCFS
and comply with the service plans. Without a warning of the risks, at least by the time of the
dispositional hearing, respondent could not appreciate the importance of compliance. We cannot
assume that the parent is aware that he could lose his parental rights if he fails to cooperate and
comply with the directives of the trial court; the legislature placed the duty on the trial court to
inform the parent at the adjudicatory and dispositional stages of the proceedings.
 We are mindful that the primary concern expressed by the Act is the best interests of the
child. Nor do we ignore that the child has a right to a stable environment and finality. However,
we believe that the due process right of the parent outweighs our desire for conclusiveness.
Moreover, it is clear that the legislature believes that the parents' right to fair notice is a
necessary element of the minor's welfare.
 Accordingly, under the circumstances here, we hold that the trial court's failure to comply
with the Act necessitates a reversal of the finding of unfitness, the order terminating respondent's
parental rights, and the judgment order awarding custody of the minor to DCFS. The cause is
remanded for a new dispositional hearing pursuant to section 2--22 of the Act (705 ILCS 405/2--22
(West 1998)). Custody of the minor pending the outcome is to remain with the present custodian or
as the trial court shall otherwise determine pending the completion of the proceedings.
 Based on our decision, we need not address respondent's remaining contentions other than to
note that on remand the court may order DCFS to structure new service plans, including one that
requires respondent to engage in effective sexual abuse therapy. However, DCFS may not compel
therapy treatment that would require respondent to incriminate himself, and the court may not base
its decision to terminate parental rights on respondent's failure to admit to a crime. See In re
L.F., 306 Ill. App. 3d 748 (1999). "[T]here is very fine but important distinction between taking
steps to terminate a parent's rights based specifically on a refusal to waive a right against self-
incrimination and doing so based upon a parent's failure to comply with an order for meaningful
therapy." L.F., 306 Ill. App. 3d at 753.
 For the foregoing reasons, the decision of the circuit court of Winnebago County is reversed,
and the cause is remanded with directions.
 Reversed and remanded with directions.
 McLAREN, J., concurs.
 JUSTICE O'MALLEY, specially concurring:
 I agree that reversal is necessary because the trial court failed to advise the respondent, in
the words of section 1--5(3) of the Act, that he was obligated to "cooperate with [DCFS], comply
with the terms of the service plans, and correct the conditions that require the child to be in
care, or risk termination of *** parental rights." 705 ILCS 405/1--5(3) (West 1998). I write to
stress that the service plan designed to reunite Andrea with her father has made no progress toward
curing the conditions that separated Andrea from her father; instead, it has harmed her. In fact,
before the visitations that traumatized Andrea were terminated by the court because of their
negative effects, the service plan was grossly inconsistent with the purposes of the governing law.

 On July 2, 1996, respondent was adjudged to have sexually abused Andrea's half-sister, Shannon
H., by fondling her buttocks, and to have thereby neglected Andrea because she was living with
Shannon H. at the time. Andrea was removed from respondent's custody following the report of abuse.
 Pursuant to a service plan instituted by DCFS in August 1995, respondent was allowed weekly
supervised visits during the pendency of the abuse/neglect petition. On July 30, 1996, following
the adjudication of the petition, Andrea was declared a ward of the court and guardianship was
placed with her mother, Connie K. Also, respondent was allowed visitation with Andrea "supervised
by DCFS per their discretion." Supervised visitation between respondent and Andrea indeed continued
under the service plan.
 In a December 1996 report to DCFS, Andrea's therapist, Chris Magnelia, of Family Advocate,
Inc., of Rockford, wrote:
 "[I]t appears Andrea *** is exhibiting post traumatic, sexual abuse related behaviors after
 visitation with her biological father, [respondent]. These behaviors involve trauma specific
 reinactment [sic], in play, recurrent distressing dreams surrounding past abuse, difficulting
 [sic] staying asleep, and enuretic episodes. These charateristics [sic] symptoms are no doubt
 being exasperated [sic] by exposure to the perpetrator of abuse."
Magnelia recommended that respondent's visits with Andrea be reduced from weekly to biweekly and
noted that "further decrease in frequency may become necessary if Andrea's visitations continue to
illicit [sic] further development of Post Traumatic Stress Disorder type symptomotology."
 On February 11, 1997, Magnelia reported to DCFS that Andrea was no longer "displaying
nightmares or bed wetting" after visitations with respondent but was continuing "to manifest
considerable opposition/defiant type behaviors at home after her visits." Magnelia noted that
Andrea told him during a previous counseling session that "she feels very uncomfortable when her
father would hold her hand, and when he would kiss her goodbye (on the lips) during visitations with
him. Andrea prefers that her father not hold her hand and that he only kisses her on the cheek when
departing from visits." Magnelia recommended that Andrea's wishes concerning physical contact with
her father be honored during the visits.
 In a February 24, 1997, report to DCFS, Magnelia wrote:
 "Andrea continues to express considerable distress and confusion in terms of having
 visitation with her father, [respondent]. [Respondent's] affections in terms of holding
 Andrea's hand and kissing her goodbye (which he was told not to do) are interrupted [sic] by
 Andrea as being a prelude to sexual abuse. Andrea frighteningly stated that when her father
 holds her hand 'I don't know if he's going to do anything more.' Andrea reported 'My dad says
 he loves me ... so I love him' (stated with indifference). This association of being told
 that one is loved by someone who has also been abusive, can be very problematic if Andrea
 confuses love and affection with sexual abuse, which would in turn make her more likely to be
 exploited in the future, by a perpetrator who exclaims [sic] love and affection, but whose
 behaviors are exploitative.
 At this time it is recommended that visitations with [respondent] are not in the best
 interests of Andrea's psychological or emotional well-being, and therefore visitations be
 terminated. Andrea's mistrust and feelings of vulnerability to subsequent abuse/exploitation
 appears to manifest itself [sic] only with her father. Andrea needs to feel safe and it is
 extremely important that Andrea not be exposed to an environment which continues to traumatize
 her."
 At the hearing on the request for the termination of respondent’s visitation, counsel for
respondent argued that Andrea was initiating the "large majority" of physical contact during the
visitations and that respondent never kissed Andrea on the lips during the visits. Observing that
"a common thread throughout the reports regarding visitation is that Andrea manifests some kind of
disturbed behavior at the conclusion, whether or not it be from conduct that she's initiating or
not," the court entered an order terminating respondent's visitation with Andrea.
 On respondent's motion, the court modified the order in October 1998 to permit supervised
visits "at the discretion of the caseworker for therapeutic purposes." The court conditioned the
visitation on respondent's completion of sex offender counseling. According to respondent's
caseworker, Christine Johnson, a requirement of sex offender counseling was that respondent admit to
having abused either Andrea or Shannon H. Respondent has never made such an admission and has never
completed sex offender counseling. His visits with Andrea have not been reestablished.
 At the hearing on the petition for the termination of parental rights, Johnson testified that,
while she was the caseworker for respondent between June 1997 and August 2000, Andrea reported that
she was "angry" with and "scared of" respondent. Andrea told Johnson that she (Andrea) was afraid
to see respondent and did not want to meet him at court. Julie Rector, who became respondent's
caseworker in August 2000, testified that Andrea stated in March 2001 that "she did not want to see
her father because she was scared of him."
 It is important to note what purposes are to be served by the governing law. "It is well
settled that the purpose of the [Juvenile Court Act] is to serve the best interest of the minor."
In re Bettie Jo R., 277 Ill. App. 3d 401, 405 (1995). In its own words, the Act’s purpose is:
 "to secure for each minor subject hereto such care and guidance, preferably in his or her
 own home, as will serve the safety and moral, emotional, mental, and physical welfare of the
 minor and the best interests of the community; to preserve and strengthen the minor's family
 ties whenever possible, removing him or her from the custody of his or her parents only when
 his or her safety or welfare or the protection of the public cannot be adequately safeguarded
 without removal." 705 ILCS 405/1--2(1) (West 1998).
The Act is to be "administered in a spirit of humane concern, not only for the rights of the
parties, but also for the fears and the limits of understanding of all who appear before the court."
 705 ILCS 405/1--2(2) (West 1998). All procedures under the Act are to be guided by the precept
that "[t]he parents' right to the custody of their child shall not prevail when the court determines
that it is contrary to the health, safety, and best interests of the child." 705 ILCS 405/1--
2(3)(c) (West 1998).
 The purpose of a service plan imposed in the wake of a finding of abuse or neglect is "to
 correct the conditions that were the basis for the
 removal of the child from the parent." 750 ILCS
 50/1(D)(m) (West 1998). A parent's failure to make
 reasonable efforts toward correcting those conditions
 pursuant to the terms of a service plan is a basis for
 the termination of parental rights. See 750 ILCS
 50/1(D)(m) (West 1998). The law recognizes, however,
 that not all attempts to reunite the minor with the
 parent who has found to have neglected the minor are
 appropriate. Section 8.2 of the Abused and Neglected
 Child Reporting Act (325 ILCS 5/8.2 (West 1998))
 provides in relevant part:
 "Family preservation services shall be offered, where safe and appropriate, to prevent the
 placement of children in substitute care when the children can be cared for at home or in the
 custody of the person responsible for the children's welfare without endangering the children's
 health or safety, to reunite them with their families if so placed when reunification is an
 appropriate goal, or to maintain an adoptive placement." 325 ILCS 5/8.2 (West 1998).
 The provisions quoted above are representative of the fact that, in all places in the Juvenile
Court Act and the Abused and Neglected Child Reporting Act where the importance of reunifying the
parent with the minor is emphasized, there is also the qualification that reunification, and
attempts at reunification in the form of service plans, should not occur at the expense of the
minor's welfare. The visitation that DCFS attempted as part of the service plan did not promote the
healing of the rift between Andrea and her father. In fact, for Andrea the visits led not to an
increased sense of closeness with her father but rather to bed-wetting, sleeplessness, nightmares,
and emotional disturbance. Andrea is openly fearful of her father; she is suspicious even of his
attempts to hold her hand. Magnelia, Andrea's therapist, offered an uncontroverted opinion that her
father's professions of love accompanied by perceived attempts at abuse may cause Andrea severe
emotional harm. Given the history of this case, I doubt whether reunification is an appropriate
goal; I am even more doubtful of the propriety of a plan to allow visitation between Andrea and an
individual like respondent upon his confession that he abused either Andrea or Shannon H.
Rehabilitation of sex offenders is a worthy goal, but in light of Andrea's profound fear and
suspicion of her father and his apparent indifference throughout this case toward bettering himself
as directed by DCFS and the court (e.g., failing to appear in court for months at a time and failing
to complete counseling for alcohol and drug abuse and domestic violence), I would think that such a
confession would be decisive grounds for disallowing visitation. I would urge DCFS, in formulating
a service plan on remand, to take full account of the harm inflicted by the previous service plan.
The Juvenile Court Act is not be construed in favor of parents at the expense of children. See In
re K.B.J., 305 Ill. App. 3d 917, 922 (1999).